# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| MICHAEL BUCK, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | C.A. No. N20C-08-249 MAA CCLD |
| v. | ) | |
| | ) | |
| VIKING HOLDING | ) | |
| MANAGEMENT COMPANY LLC, | ) | |
| | ) | |
| Defendant. | ) | |

Submitted: June 14, 2024
Decided: September 30, 2024

## POST-TRIAL MEMORANDUM OPINION

John M. LaRosa, Esquire, of LAROSA & ASSOCIATES LLC, Wilmington, Delaware, and Lawrence P. Schaefer, Esquire, Bert Black, Esquire, Mack H. Reed, Esquire, Timothy S. Christensen, Esquire (Argued), and Anne C. Bolgert, Esquire, (Argued) of SCHAEFER HALLEEN, LLC, Minneapolis, Minnesota, Attorneys for Plaintiff.

Peter H. Kyle, Esquire (Argued), John L. Reed, Esquire, and Daniel P. Klusman, Esquire, of DLA PIPER, LLP, Wilmington, Delaware, Attorneys for Defendant.

**Adams, J.**

## I.  INTRODUCTION

This is a breach of contract action arising from plaintiff Michael Buck's termination from Novus Media, LLC ("Novus").  Prior to Buck's termination, he held a membership interest ("Units") in Defendant Viking Holding Management Company ("Defendant" or "Holdco") and served as the Chief Financial Officer of Holdco's subsidiary, Novus.

In April 2020, Buck's employment at Novus was terminated.  After Buck's termination, Holdco exercised a repurchase option for Buck's Units for $0.  Holdco argues that pursuant to Holdco's Limited Liability Company Agreement (the "Holdco LLC Agreement" or the "Agreement"), Buck is entitled to $0 for his Units because Buck was terminated for Cause, as defined by the Agreement.  Buck argues the reasons for his termination were manufactured by Holdco, and therefore he is entitled to the Fair Market Value of his interest at the time Holdco initiated the repurchase.  For reasons discussed herein, the Court finds that certain of the reasons for Buck's termination were manufactured by Holdco and the remaining reasons for Buck's termination do not meet the definition of Cause.  Judgment is therefore entered in favor of Buck, and Buck is entitled to the Fair Market Value of his Units.

## II.    FACTS[1]

### A.    The Parties

Holdco controls Novus. Holdco owns 80% membership of an intermediary company known as Viking Parent LLC ("Viking Parent").[2]  The remaining 20% membership of Viking Parent is held by nonparty Omnicom Media Group ("Omnicom").[3]  Viking Parent owns 100% membership of Novus.[4]

Buck served as Chief Financial Officer of Novus (and its predecessor entity, Novus Media Inc.) from February 2016 until his termination on April 17, 2020.[5]  Prior to his termination, Buck held 100 Class B Holdco non-voting membership Units.[6]  Buck received these Units for no cost, and the Units fully vested on April 12, 2020.[7]

### B.    The Restructuring

Prior to Buck's employment, Novus Media Inc. transitioned from one financial system, Mercury, to another, Microsoft AX, in August 2015.[8]  Novus

---

[1] In this section, the Court largely relies upon language from the "Relevant Facts" section of its February 15, 2024, Memorandum Opinion denying cross motions for summary judgment.  (D.I. 234) [hereinafter "Mem. Order Den. Summ. J."].  The adopted language discusses relevant facts supported by the record after trial.  Additional relevant factual findings are incorporated into the Analysis Section of this decision.

[2] Pretrial Stipulation and Proposed Order at 5 (D.I. 256) [hereinafter "Pretrial Stip."].

[3] *Id.*

[4] *Id.*

[5] *Id.* at 4, 13.

[6] *Id.* at 5.

[7] *Id.* at 11.

[8] *Id.* at 4

Media, Inc. underwent a restructuring in April 2017.[9]  Novus Media, Inc. became

Novus Media LLC.  Viking Parent became the new 100% owner.  Buck received

Units in Viking Parent's owner, Holdco, as part of this restructuring.

## C.  Holdco's Repurchase Option

The Agreement provides the terms that govern Buck's membership interest.[10]

Section 9.10(a) provides Holdco held the right to repurchase Buck's Units when his

employment at Novus ended.[11]  Under Section 9.10(b) of the Agreement, if Buck

was terminated for Cause, as defined by the Agreement, Holdco could repurchase

Buck's Units for the lower of the cost Buck paid – in this case, $0 – and the fair

market value of the Units.[12]  If Buck's employment was terminated without

satisfying the Cause definition in the Agreement, Holdco could only repurchase

Buck's Units for the fair market value at the time of the closing date set for the

repurchase.[13]

The Agreement defines the mechanics for a repurchase, including the method

of notifying the Unitholder and setting a closing date for the repurchase, in the

remainder of Section 9.10.[14]

---

[9] *Id.* at 3.
[10] *Id.* at 5.
[11] *Id.*
[12] *Id.* at 6.
[13] *Id.*
[14] JX 18 at § 9.10.

## D. Reconciliation Issues at Novus

After changing financial systems in 2015, Novus experienced continuing issues resulting from its conversion to Microsoft AX.[15] As a result of data reconciliation issues, Novus' finance department established a new clearing account to house unreconciled accounts or activity (the "AMR Account").[16]

During Buck's tenure as CFO, in April 2017, Viking Parent and Novus entered into a loan agreement with Citibank.[17] In April 2020, prior to Buck's termination, Novus made the final payment on the loan, discharging it.[18]

Auditing firm Grant Thornton audited Novus' 2017 and 2018 financial information.[19] In April 2018, Novus received Grant Thornton's 2017 audit findings.[20] Novus "passed" the 2017 audit, receiving an unqualified opinion.[21]

One year later, in April 2019, Grant Thornton received an anonymous Whistleblower Letter (the "Whistleblower Letter"), identifying weaknesses in the

---

[15] Transcript of Bench Trial Proceedings, April 16, 2024, at 186:18-23 (D.I. 277) [hereinafter "Tr. Apr. 16"].
[16] *Id*; Transcript of Bench Trial Proceedings, April 16, 2024, at 14:5-19 [hereinafter "Tr. Apr. 15"]; Tr. Apr. 16 at 239:17-242:17.
[17] Tr. Apr. 15 at 46:11-47:19; JX2.
[18] Tr. Apr. 15 at 46:11-47:19; JX2.
[19] Pretrial Stip., at 11-12.
[20] *Id.* at 11.
[21] Tr. Apr. 15 at 187:6; Transcript of Bench Trial Proceedings, April 17, 2024, at 42:8-10 [hereinafter "Tr. Apr. 17"]; Pl. Michael Buck's Post Trial Opening Br. & Answering Br. to Def. Viking Holding Management Company LLC's Post-Trial Opening Br. at 16-17 (D.I. 279) [hereinafter "Buck Post-Trial Opening"].

Novus finance department.[22]  Novus hired Thompson Coburn to investigate the allegations of the Whistleblower Letter.[23]

Thompson Coburn investigated the conduct contained in the Whistleblower Letter by performing interviews of eight current and former Novus finance department employees, including Buck.[24]  Thompson Coburn also reviewed Novus records, corporate structure documents, email communications with contractors, and human resources records including exit interviews and exit surveys.[25]  Thompson Coburn submitted an investigation report to Novus on November 25, 2019.[26] Thompson Coburn found:

- a year-end 2017 $1.7 million write-off, and several days later in 2018, reversal, on Novus' books were "potentially fraudulent."  Thompson Coburn, however, did "not uncover sufficient evidence to prove intentional wrongdoing or fraud;"[27]

- an employee left Novus due to "ethical" concerns relating to Novus' accounting practices.  Buck's failure to notify the Novus Board of Directors "may constitute a breach of [his] fiduciary duties[.]"[28]

As part of their investigative process, Thompson Colburn hired Ernst & Young to provide further analysis of the Whistleblower Letter.  Specifically, Ernst & Young investigated "potential issues with involving [*sic*] historical revenue, expenses,

---

[22] Pretrial Stip. at 12; JX 24.
[23] *Id.*
[24] JX 27.
[25] *Id.*
[26] Pretrial Stip. at 12.
[27] JX 27 at 3.
[28] *Id*. at 4.

accounts payable, credit card clearing accounts, accounts receivable and reconciliation accounting procedures" discussed in the April 2019 anonymous Whistleblower Letter.[29]  On November 25, 2019, Ernst & Young submitted a report to Thompson Coburn regarding its findings.[30]  Ernst & Young found that Novus was "unable to determine the nature and purpose of certain underlying transactions recorded to the Accrued Media Research ("AMR") Account."[31]  Ernst & Young also found "two year-end write-offs and one subsequent reversal accounting entries made without explanation," that "certain email correspondence was indicative of potential pressure to meet financial targets at year-end 2017," that Buck had approved manual journal entries in Novus' books, and that "an approximate $3.3 million gain [would] be realized in the 2019 financial statements as a result of the clean-up of Bad Data."[32]

Ernst & Young later submitted an addendum to their report on December 20, 2019.[33]  In the December 20 addendum, Ernst & Young corrected an inaccuracy regarding their previous observation: that they found "two year-end write-offs and one subsequent reversal accounting entries made without explanation."[34]  Further documentation provided to Ernst & Young demonstrated that the write-offs caused a temporary gain on Novus' income statements, but were each offset by an equivalent

---

[29] JX 28 at 2.
[30] Pretrial Stip. at 12.
[31] JX 28 at 5.
[32] Id. at 6-7.
[33] Pretrial Stip. at 12.
[34] JX 35, at 6.

decrease to income posted the same day as the corresponding gain.[35]  Because of the offsets, the impact on Novus' 2017 and 2018 income statements caused by the write-offs discussed in the Thompson Coburn and Ernst & Young reports was $0.[36]

Just seven days after Ernst & Young's December 20 addendum, Novus hired accounting firm FGMK, LLC to provide further analysis into the Novus finance department's issues.[37]  FGMK "focused on defining the nature of the problem [with Novus' finance department] and a recommended path forward."[38]

FGMK visited Novus in January 2020.[39]  Among the findings gathered from its onsite visit to Novus, FGMK noted that "current practices" were "not typical accounting" practices and have "likely led to the need for large material journal entries at year end."[40]  FGMK further indicated that the change from one financial system to another was the "root cause" for the need to create the AMR Account.[41]

In addition, FGMK reported the "AMR situation" demonstrated "a lack of institutional control," and "[t]here appears to be no defined plan to resolve the AMR situation, nor has there been since it first emerged in 2015."[42]  FGMK further found

---

[35] JX 35 at 8-10.
[36] Id. at 10.
[37] Tr. Apr. 15 at 214:23-216:9; Viking Holding Management Company LLC's Opening Post-Trial Br. at 22 (D.I. 278) [hereinafter "Holdco Post-Trial Opening"]; JX 44.
[38] JX 38 at 2.
[39] JX 44 at 1.
[40] Id. at 2.
[41] Id.
[42] Id. at 3-4.

that the "current CFO" did not have the "requisite skills" to lead the finance team at Novus.[43] FGMK, in its final assessment submitted in March 2020, recommended that Novus fire Buck and hire a new CFO immediately.[44]

On April 1, 2020, Grant Thornton issued its Consolidated Financial Statements and Report of Independent Certified Public Accountants.[45] Even after the Whistleblower Letter led Grant Thornton to revisit its 2017 and 2018 audits, Novus passed both audits with an unqualified opinion.[46]

### E.    David Murphy Terminates Buck

On April 17, 2020, Novus Chief Executive Officer David Murphy ("Murphy") terminated Buck.[47] During the termination phone call, Murphy followed a script that outlined reasons for Buck's termination (the "Termination Script" or "Script").[48] On his Script, Murphy noted Buck was being terminated for Cause as outlined in the Holdco LLC Agreement.[49] Murphy alleged Buck was guilty of gross negligence and willful misconduct, and provided several specific reasons for Buck's termination:

- inability to provide the Strategic Planning necessary for long term improvements in [Buck's] Department's performance
- ineffective Finance and Accounting Team Management

---

[43] *Id.* at 4.
[44] Holdco Post-Trial Opening at 23; JX 56 at Slide 76.
[45] Pretrial Stip. at 12; JX 70.
[46] JX 70 at NOVUS02244; Tr. Apr. 15 at 60:10; Transcript of Bench Trial Proceedings, April 17, 2024, at 42:8-10 [hereinafter "Tr. Apr. 17"]; Buck Post-Trial Opening at 16-17.
[47] Pretrial Stip. at 13.
[48] JX 77.
[49] *Id.*

- the inability to execute the proper management of the Accounting and General Ledger operations
- the lack of appropriate Financial Oversight and Control measures
- significant gaps in [Buck's] oversight of the Financial Analysis, Budgeting and Forecasting functions[50]

By letter dated June 17, 2020 (the "Lorenc Letter"),[51] Thompson Colburn attorney Susan Lorenc, outside counsel for Novus, provided further reasons to support Buck's for Cause termination:

- An anonymous whistleblower letter received in April 2019 by Grant Thornton, Novus' independent auditors, noted that "an unqualified opinion on the financial statements should not be issued for 2018 fiscal year." This letter alleged numerous accounting and financial problems, including that Mr. Buck approved entries to "bury part of the [unreconciled accounts] problem," vendors are paid duplicate times ("Novus is out the $$, is clueless and has no idea what that $$ amount represents") and "Michael Buck is not engaged in the detail."
- As part of the Thompson Coburn independent investigation, which grew out this anonymous whistleblower complaint, the report noted: "We also learned that at least two people informed CFO Michael Buck that Ms. Lee [former employee] reportedly left Novus Media due to ethical concerns about Novus Media's financials and audit practices. According to information developed in our investigation, Mr. Buck failed to notify the Board of Directors or anyone within Novus. Mr. Buck's failure to notify the Board, in additional to his claim that he was unaware of the $1.7 million write-off and reversal in 2017 until we confronted him with in in October 2019, raise significant concerns about Mr. Buck's diligence and competence. These actions may also constitute a breach of Mr. Buck's fiduciary duties as an officer of Novus." (Emphasis supplied.)
- EY, who was hired by Thompson Coburn to provide accounting expertise, stated in their initial report: "Mr. Buck stated during his

---

[50] *Id.*

[51] The Lorenc Letter and Termination Scropt contain numerous typographical errors. The Court did not attempt to correct these errors and instead copied the Lorenc Letter and Termination Script into this opinion as they were written.

interviews that he did not approve manual journal entries and had no knowledge of the write-offs and reversals impacting the AMR account; however, EY identified three instances in which he was emailed journal entry support and was asked for his approval to make the entry, which he gave over email." This lack of knowledge is very troubling and inconsistent with CFO standards.

- Further EY noted to Murphy that they believed he was in the bottom quartile of CFOs they have encountered, inconsistent with others acting as a CFO.
- The investigation revealed that Mr. Buck would often assign junior accounting people, often consultants and not employees, to functions inconsistent with their experience and role.
- FGMK, one of the largest accounting firms in Chicago, was hired to conduct an examination of the Novus Finance Department and provide additional resources to correct identified weaknesses.
- FGMK noted substantially failures of leadership and operations in the 2019/202 NetSuite ERP implementation project.
- FGMK identified substantial and wide ranging [sic] organizational deficiencies across all areas of Novus's Finance Department's operations. The lowest rating of AD HOC, was given to the vast majority "Finance Processes" due to lack of metrics and/or improvement mechanisms. The area of Risk and Controls received similarly low ratings. Again contrary to existing finance department standards.
- FGMK findings correlate with Novus senior executive observations shared and discussed with Mr. Buck regarding his complete lack of strategic and operational planning around projects both large and small, again conflicting with senior leadership standards.
- In each of the 2017 and 2018, GT management reports noted a "material weakness" in internal controls, the most severe warning an audit firm can provide.
- GT noted that Novus' financial controls rank in the bottom 5% of all companies they audited. They expressed a lack of confidence in Mr. Buck's ability to manage the finance team and deliver satisfactory level of management oversight and control practices.
- GT informed Mr. Murphy that if Mr. Buck continued in the CFO role, GT would terminate the relationship and would not conduct any further audits because of his lack of competence in overseeing the preparation of the financial statements.

- FGMK analysis stated that the AMR project clearly demonstrated the Finance Department's lack of institutional control and was not prioritized properly given the material impact on the accuracy of the financial statements.
- A historical analysis of Novus turnover and exit interviews clearly establishes the consistent and long term [sic] pattern of hands off, uninvolved CFO behavior by Mr. Buck. Establishing Mr. Buck as an executive who is dangerously uninterested and disconnected from day to day [sic] operations as well as major critical initiatives, gross negligence of his duties and obligations to Novus and its interest holders.[52]

On April 22, 2020, Buck received the Redemption Agreement, Separation Agreement, and General Release (the "Separation Agreement") from Novus.[53] The Separation Agreement provided the terms for Buck's termination.[54] On May 15, 2020, counsel at Thompson Coburn sent Buck a letter informing him that Holdco would repurchase Buck's Units for the cost he paid, $0, pursuant to Section 9.10 of the Agreement.[55]

## II. RELEVANT PROCEDURAL HISTORY

Buck filed his Complaint on August 27, 2020, alleging three counts: (I) Breach of Contract, against Defendants Holdco, Viking Parent, and Novus; (II) In the Alternative, Breach of the Implied Covenant of Good Faith and Fair Dealing, against Defendants Holdco, Viking Parent, and Novus; and (III) In the Alternative,

---

[52] JX 81.
[53] JX 78.
[54] *Id.*
[55] JX 80.

Tortious Interference with Contractual Relations, against Defendant Novus.[56]  On October 12, 2020, Defendants filed a Motion to Dismiss.[57]  On February 22, 2021, the Court dismissed the Complaint in its entirety, dismissing Buck's Counts I and II with prejudice, and Count III without prejudice, leaving Holdco as the sole defendant in this action.[58]

On April 1, 2021, Buck filed his First Amended Complaint against Holdco alleging one count for breach of contract.[59]  On May 18, 2021, Holdco moved to dismiss pursuant to Superior Court Civil Rule 12(b)(6).[60]  On September 3, 2021, the Court denied the motion citing the rule's minimal pleading standard.[61]  On September 27, 2021, Holdco filed its Answer to the Amended Complaint.[62]

On August 23, 2022, Buck filed a motion to compel Holdco to Respond to Buck's First Set of Interrogatories and Requests for Production of Documents.[63]  On October 6, 2022, the Court held oral argument on the motion and most notably clarified that this action is one for breach of contract, not wrongful termination.[64]

---

[56] D.I. 1.
[57] D.I. 2.
[58] D.I. 23.
[59] D.I. 24.
[60] D.I. 27.
[61] D.I. 35.
[62] D.I. 39.
[63] D.I. 53.
[64] *Buck v. Viking Hldg. Mgmt. Co.*, N20C-08-249 AML CCLD (Del. Super. Oct. 6, 2022); D.I. 62 [hereinafter "MTC Tr."].  The Court stated:
> [T]he claim that the court allowed to survive . . . was that Mr. Murphy or Novus manufactured the reasons for Mr. Buck's termination; that is, he had reasons other than those stated in the June 17th letter. He wanted to terminate him for one reason,

On May 11, 2023, the case was reassigned to Judge Adams after now-Justice LeGrow was appointed to the Supreme Court of Delaware.[65]

On November 15, 2023, both parties filed motions for summary judgment.[66] On February 15, 2024, the Court denied both motions for summary judgment and denied three of the parties' *Daubert* motions.[67]

Motions in limine continued to be filed by both parties in anticipation of trial. On April 11, 2024, the Court held a pre-trial conference ruling on all pending pre-trial motions.[68] On April 12, 2024, the Court issued a Letter Opinion clarifying the burden of proof at trial, indicating:

> Defendant bears the burden of proof that Plaintiff was fired 'for Cause' as it is defined in the Agreement. If the Court finds that there was no Cause, Plaintiff has the burden to prove damages. Plaintiff also has the burden to present evidence that the reasons cited by Defendant were manufactured after the fact.[69]

---

and he manufactured reasons to do so. And that the reasons that are stated in the June 17th letter were not the reasons that Novus actually terminated Mr. Buck.

There's a breach of contract dispute about, once we know what the reasons for Mr. Buck's termination are, given the definition of 'Cause' under the LLC agreement. Certainly that claim exists. But that claim is pretty narrow and really is focused on—it's really a contractual interpretation question at that point. *Id.* at 29:17–30:9.

[65] D.I. 84.

[66] D.I. 124, 125. The parties also filed several motions in limine and *Daubert* motions concurrently with briefing on the summary judgment motions.

[67] Mem. Order Den. Summ. J.

[68] D.I. 268. During post-trial briefing, Buck did not renew his objection to the Lorenc Letter. Buck renewed his objection to the FGMK Report and certain Grant Thornton evidence, but the Court is either excluding such evidence or otherwise not relying on it for purposes of the Cause definition. As such, the Court need not address Buck's continuing objections.

[69] D.I. 266, at 2 [hereinafter "Letter Op."].

The Court held a three-day bench trial from April 15 through April 17, 2024. Defendant filed its Opening Post-Trial Brief on May 3, 2024.[70] Buck filed his Opening Brief and Answering Brief to Defendant on May 17, 2024.[71] On May 31, 2024, Defendant filed its Reply Brief and Answering Brief.[72] On June 7, 2024, Buck filed his Reply Brief and Answering Brief.[73] The Court heard post-trial oral argument on June 14, 2024.[74]

## III. ANALYSIS

### A. Standard of Review for a Post-Trial Opinion

#### 1. The Burden of Proof

In a civil trial, a party bears the burden of proving its claims by a preponderance of the evidence.[75] Proof by a preponderance of the evidence means "proof that something is more likely than not."[76] If the evidence presented by the parties "is inconsistent, and the opposing weight of the evidence is evenly balanced,

---

[70] D.I. 275.
[71] Buck Post-Trial Opening. Given that both parties had burdens of proof at trial, the Court allowed each side to submit an Opening Brief for the issues on which they had a burden.
[72] D.I. 280 [hereinafter "Holdco Post-Trial Answer"].
[73] D.I. 282 [hereinafter "Buck Post-Trial Reply"].
[74] D.I. 284.
[75] *See, e.g., Navient Sols., LLC v. BPG Off. P'rs XIII Iron Hill LLC*, 2023 WL 3120644, at *10 (Del. Super. Apr. 27, 2023).
[76] *Feenix Payment Sys., LLC v. Blum*, 2024 WL 2768386, at *10 (Del. Super. May 29, 2024).

then 'the party seeking to present a preponderance of the evidence has failed to meet its burden.'"[77]

For a breach of contract claim, the burden ordinarily falls on the plaintiff asserting the breach.[78]  In this case, the Court shifted the burden to accommodate the unique circumstances of the parties.[79]  Parties can choose to allocate the burden of proof in a contract; failure to do so results in the Court applying common law principles of allocation.[80]  Absent such a contractual provision here, the Court determined that Buck had the burden to prove that the Cause reasons listed in the Lorenc Letter and Termination Script were manufactured.  If Buck failed to meet his burden on any of the reasons, Holdco had the burden of establishing Cause existed under the Agreement to avoid its obligation to repurchase Buck's shares at Fair Market Value.  If Holdco failed to meet its burden, Buck then had the burden to prove, by a preponderance of the evidence, his damages for Holdco's breach.

Despite this unusual burden shift, the Court notes the Supreme Court of Delaware has reinforced that whether a court decides to burden shift or not only

---

[77] *Interim Healthcare, Inc. v. Spherion Corp.*, 884 A.2d 513, 545 (Del. Super. 2005) (quoting *Eskridge v. Voshell*, 593 A.2d 589 (TABLE), 1991 WL 78471, at *3 (Del. 1991)).
[78] *Mullin v. Ascetta*, 2021 WL 4272063, at *2 (Del. Super. Sept. 20, 2021) (citing *McCoy v. Cox*, 2007 WL 1677536, at*6–7 (Del. Super. June 11, 2007)).
[79] Letter Op.
[80] *AB Stable VIII LLC v. Maps Hotels & Resorts One LLC*, 2020 WL 7024929, at *48 (Del. Ch. Nov. 30, 2020).

makes a difference where the evidence is balanced; the burden is irrelevant if the evidence is "so overwhelming" for one side.[81]

## 2. The Judge as the Fact Finder

In a bench trial, the judge is the fact finder[82] and "must assess the credibility of each witness and determine the weight given to the testimony."[83] To reach a verdict on the issues, the Court considers all exhibits, live and deposition witnesses, the parties' arguments, and the applicable Delaware law.[84] The Court can consider "each witness's means of knowledge; strength of memory; opportunity to observe; how reasonable or unreasonable the testimony is; whether it is consistent or inconsistent; whether it has been contradicted; the witnesses' biases, prejudices, or interests; the witnesses' manner or demeanor on the witness stand; and all circumstances that according to the evidence, could affect the credibility of the testimony."[85] After reviewing all the evidence presented, the court in its discretion as the fact finder is "free to accept or reject any and or all sworn testimony."[86]

---

[81] *Ams. Mining Corp. v. Theriault*, 51 A.3d 1213, 1242–43 (Del. 2012).

[82] *See, e.g.*, *Shallcross Mortg. Co. v. Ewing*, 2024 WL 3738713 at *1 (Del. Super. Aug. 9, 2024) (citing *Torres v. Bishop*, 2021 WL 6053870, at *4 (Del. Super. Dec. 21, 2021)).

[83] *Williams v. Bay City, Inc.*, 2009 WL 5852851, at *1 (Del. Super. Dec. 23, 2009) (internal citations omitted).

[84] *Outbox Sys., Inc. v. Trimble, Inc.*, 2024 WL 1886089, at *7 (Del. Super. Apr. 30, 2024).

[85] *Zenith Energy Terminals Joliet Hldgs. LLC v. CenterPoint Props. Tr.*, 2024 WL 3570165, at *3 (Del. Super. July 29, 2024) (citing Super. Ct. Civ. Pattern Jury Instruction 23.9).

[86] *Pardo v. State*, 160 A.3d 1136, 1150 (Del. 2017).

When considering testimony from expert witnesses, "the Court may consider the expert's qualifications, the reasons for the expert's opinions, and the reliability of the information supporting the expert's opinions," as well as all considerations for weighing a lay witness's testimony.[87]

## B. The Court finds that some of the reasons for Buck's termination were manufactured or otherwise excluded based on the law of the case.

### 1. Relevant Prior Rulings Governing the Scope of the Issues

The scope of the issues at this trial have been a point of contention between the parties since the beginning of this action. Buck maintains the allegations against him for his work performance are inaccurate. The Court, however, was not asked by the sole claim in this case to determine whether Buck was good at his job; the Court was asked to interpret a contract.

This point of clarification arose as part of Buck's motion to compel in 2022, wherein Buck sought to access certain third-party discovery including entities retained by Defendant to complete audits.[88] There, the Court noted "[Buck] and [Holdco] have a different understanding of what needs to be determined in this case."[89] Buck emphasized that, even if the merits of the allegations against Buck were not at issue, Buck had alleged, and intended to pursue allegations that Holdco

---

[87] *MRPC Christiana LLC v. Crown Bank*, 2017 WL 6606587, at *7 (Del. Super. Dec. 26, 2017).

[88] Motion to Compel Defendant to Respond to Plaintiff's First Sets of Interrogatories and Requests for Production of Documents (D.I. 53).

[89] MTC Tr. 22:15–17.

had "come up with reasons [to] rely upon to terminate Mr. Buck for Cause and divest him of his units."[90]

During the motion to compel hearing, the Court clarified that any evidence as to whether or not Buck was appropriately fired would better proceed under an un-alleged wrongful termination claim, not a breach of contract claim.[91] Because only the breach of contract claim survived the motion to dismiss, the Court limited the discovery to the claim as pled: whether: "Mr. Murphy or Novus manufactured the reasons for Buck's termination; that is, he had reasons other than those stated in the June 17th letter."[92] If the reasons were not manufactured, then the only remaining issue for the Court is to determine whether the reasons provided for Buck's termination meet the definition of Cause under the Agreement.[93]

During the summary judgment phase of this action, Holdco took a similarly narrow stance, arguing the reasons for Buck's termination were articulated in the Lorenc Letter. [94]

---

[90] *Id.* at 26:19–21.

[91] *Id.* at 27:17–28:4.

[92] *Id.* at 29:20-23. The Court therefore narrowed the scope of discovery and did not permit "an open sesame to a subpoena directed to every firm that Novus retained, Grant Thornton, Ernst & Young," but was "really a question of Novus and whether Novus was manufacturing the reasons." *Id.* at 30:12-16.

[93] MTC Tr. 31:4–8.

[94] Defendant Viking Management Company Opening Br. in Support of its Mot. for Summ. J. SJ at 3 ("the undisputed facts establish that: (i) the reasons outlined in the June 17 Letter, and used by Holdco to conduct its "Cause" analysis, were the actual reasons for Buck's termination by Novus and were not manufactured by Holdco; and (ii) Holdco acted in good faith in making its determination that those reasons satisfy the definition of "Cause."); *Id.* at 20 ("Murphy, Holdco's manager and the CEO of Novus, further confirmed at deposition that the reasons identified in the

19

During the pre-trial conference on April 11, 2024, the Court handled related issues. Buck moved to (1) exclude evidence outside the four corners of the Lorenc Letter;[95] (2) to exclude evidence related to Grant Thornton;[96] and (3) to exclude evidence related to FGMK.[97]

Defendant moved to (1) preclude evidence or argument relating to "wrongful termination" issues;[98] (2) preclude evidence or argument challenging the reasons for Buck's termination by non-party Novus, as outlined in the Lorenc Letter and detailed in the supporting independent reports;[99] (3) to exclude expert testimony from Buck himself;[100] and (4) to exclude valuation opinions and testimony of Ralph Koch.[101]

The Court granted the motion to exclude Buck as an expert in his own trial[102] and granted the motion to exclude Koch's belatedly produced valuation opinions and testimony.[103] The Court denied all other pre-trial motions, reserving the issues for objections at trial, and argument in post-trial briefing.[104] Throughout the pre-trial hearing, the parties continued to struggle with the proper scope of the issues; in

---

June 17 Letter, which were just a summary of the independent reports identified above, were indeed the reasons for Buck's termination and his subsequent finding of 'Cause'") (D.I. 125) [hereinafter "Viking MSJ Opening"].

[95] D.I. 221.
[96] D.I. 222 [hereinafter "MTE Grant Thornton"].
[97] D.I. 223.
[98] D.I. 216.
[99] D.I. 217.
[100] D.I. 220.
[101] D.I. 250.
[102] D.I. 261.
[103] D.I. 257.
[104] D.I. 258, 259, 260, 262, 263, 264.

particular how evidence would be used, and for what purpose, *i.e.*, whether something was being offered for its truth, or for some other purpose. The Court reinforced the prior motion to compel ruling, and noted issues of evidence are better addressed at trial in a bench trial, where the Court can more fully consider the context and manner in which evidence is presented.[105]

The Court made a final clarification on the scope of proof in its Letter Opinion on the burden of proof allocation on April 12, 2024, stating in relevant part:

> As a final point of clarification before trial, this Court notes that requiring Plaintiff to have the burden would improperly impose a burden to prove a negative. The "negative" in this case would be the reasons Defendant asserts as the reasons for the termination do not constitute "for Cause" as it is defined by the Agreement. The "negative" is *not* that Plaintiff was otherwise a good employee and that the reasons Defendant asserts lack veracity. This is a breach of contract case—asking the Court to interpret the definition of "for Cause" as it applies to Defendant's reasons—*not* a wrongful termination case determining whether or not Defendant's reasons are an accurate depiction of Plaintiff's performance.[106]

With that procedural posture and contextual backdrop, the Court now considers the merits of the claims and proof from trial.

---

[105] *See, e.g.*, *Beard Rsch., Inc. v. Kates*, 2009 WL 7409282, at *6 (Del. Ch. Mar. 31, 2009) ("[A]lthough it is critical in a jury trial for a court to exercise its gatekeeper function in advance of allowing an expert to testify, the importance of addressing issues raised under Daubert and Rule 702 before an expert testifies is more attenuated in a bench trial. . . . In large part because this is a bench trial, I consider it more prudent to hear the evidence at trial and consider the damages theory and Defendant's criticisms of it in the context of the full record. Moreover, it will be more efficient to consider the reliability of the expert's methodology after trial, because by then the Court will have had the benefit of hearing both sides' experts address the complex damages issues presented[.]").
[106] Letter Op. at 2 (internal citations omitted) (emphasis in original).

2.     <u>Reasons one and four from Holdco's Opening Post-Trial Brief, along with the FGMK Report were "Manufactured" and therefore excluded.</u>

The Lorenc Letter has been at center stage of this action since its inception. As part of the Court's ruling during the pre-trial conference, the Court held it would be "unlikely for [the Court] to allow other evidence that's not been in the Lorenc Letter to be something that meets the definition of Cause."[107] Given the history of this case and Defendant's focus on the Lorenc Letter as evidence of Cause for Buck's termination, the only evidence the Court will consider are the issues raised in the Lorenc Letter and evidence that can reasonably be tied to it. Although Holdco did not previously mention the Termination Script as support for its Cause determination, Buck does not dispute that Script also contained the alleged reasons for Buck's termination. Buck maintains the reasons in the Script were manufactured.[108]

The Court now turns to the merits of Buck's claim regarding manufacturing. By the time of post-trial briefing, Holdco narrowed its focus to just six reasons regarding Buck's termination for Cause:

1.     Buck acted recklessly with respect to the AMR Account;

2.     Buck failed to inform Murphy of the AMR issues;

3.     Buck's Conduct with respect to Mai Lee;

---

[107] Pretrial Conference Transcript at 22:8-11, Apr. 11, 2024.
[108] Buck Post-Trial Opening at 2.

4.      Buck misrepresented the issues to the Company's lender, Citibank;

5.      Buck hid his AMR Account practice and underlying reconciliation issues from the Company's auditors;

6.      The AMR issues were material and caused a material misstatement of Novus' 2017 Annual and Interim Financial Statements.

Buck argues that each of these reasons are manufactured, and the Court should not consider any of them for purposes of Cause.[109] The Court appreciates that the Lorenc Letter is a document devoid of context and, at trial, the parties would necessarily need to assist the fact finder with understanding the circumstances surrounding each stated reason. At trial, however, much of the evidence presented by Holdco included evidence well outside of the scope of the Lorenc Letter (or the Termination Script). As described below, the Court will not consider this evidence because the law of the case is that Holdco is limited to the issues raised in the Lorenc Letter and those reasonably inferred from it.

3.      <u>The Court will not consider points two and four from Holdco's Post-Trial Brief or the FGMK Report for the determination of cause.</u>

The Court finds, by a preponderance of the evidence, that reasons two (Buck failed to inform Murphy of the AMR issues), four (regarding Citibank) and the FGMK Report are manufactured. The Court will not consider them for purposes of the Cause determination.

---

[109] Buck Post-Trial Opening at 28, 31, 33, 38, 39, 42.

After having relied on the Lorenc Letter and Termination Script throughout this action as a basis for opposing third party discovery and in support of summary judgment Holdco cannot now argue that other reasons – not at all discussed or reasonably incorporated into the points made in the Lorenc Letter or the Termination Script from Murphy – were the reasons for Buck's termination.

First, during Murphy's cross examination at trial, Murphy, the CEO of Novus and Manager of Holdco, admitted that issue two, regarding Buck's purported failure to inform Murphy of the AMR issues, was not in the Lorenc Letter or Termination Script:

> Q. And you've talked about Mr. Buck not informing you about the AMR issue. Yes or no, was that mentioned in the script or the letter?
> A. No.[110]

Holdco's counsel did not redirect Murphy about this issue. Holdco also did not rebut Buck's argument that this issue was manufactured in its post-trial briefing. Given these concessions by Holdco, the Court will not consider Buck's failure to inform Murphy of the AMR issue for purposes of the Cause determination.

Second, the Court agrees with Buck that the Citibank issue is a litigation-driven argument in an attempt to fit Buck's termination within the definition of Cause. In an apparent recognition of this, Holdco does not dispute this point in its

---

[110] Tr. Apr. 16 at 17:19-22.

Post-Trial Reply Brief. Therefore, the Court will not consider the Citibank issue for purposes of the Cause determination.

This is not to say, however, that because the Court is permitting a reason from the Lorenc Letter to be considered for the Cause determination, that each part of that bullet point will be considered. The Court will consider reasons one, three, five and six only to the extent Holdco has provided some evidence in their post-trial briefing regarding the point.[111]

Third, Buck has proven, by a preponderance of the evidence, that the FGMK report was manufactured and will not be considered by the Court as evidence of Cause. Among other reasons, the Court notes the following regarding the FGMK report:

- Novus engaged FGMK seven days after Ernst & Young issued its addendum, where Ernst & Young stated that the AMR Account resulted in a $0 impact to Novus' 2017 and 2018 income statements,[112] suggesting that Novus (and Murphy) were unhappy with that conclusion;

---

[111] For example, Lee is referenced by name in the Lorenc Letter regarding her purported ethical concerns, but not regarding Buck's assignment of Lee to the 2017 audit. Although Buck argues that Lee's assignment to the 2017 audit was "manufactured," the Court determines that the "junior accounting people" assigned "to functions inconsistent with their experience and role" includes Lee.

[112] Tr. Apr. 16 at 49:11-17; JX 35 at 6, 10.

- The FGMK Report was issued on January 17, 2020, only twenty days after Novus engaged FGMK;

- Murphy labeled the report "Key Evidence" in his own contemporaneous handwritten notes;[113]

- During direct examination at trial, Murphy testified that "[o]nce that whistleblower letter arrived, we were on a -- a train to a conclusion;"[114]

- Novus subsequently engaged FGMK on another project and eventually became Novus' financial auditor;[115] and

- Holdco's Post-Trial Opening Brief Argument Section barely touches upon the FGMK report to support the "Cause" determination.[116]

---

[113] JX 44 at NOVUS01177. During Murphy's cross examination, Murphy did not testify credibly about why he put the words "Key Evidence" on this report. In response to questioning as to why Murphy labeled the FGMK Report as "Key Evidence," but not other documents, Murphy testified, "I can give you my guess of why. Because I've got huge binders piled in the office of all these third-party investigations. This is an email. It's not a bound document. It's in a series of emails. It might have been discovered – I don't recall exactly. It might have been discovered in the Ernst & Young search. And when you're reading through hundreds of documents, you're putting a pile here 'meaningless,' and a pile here, 'important.' That would be my likely behavior to this." Tr. Apr. 16 at 64:3-14. First, the FGMK Report is not an email, or a series of emails. It is just that – a report. Second, Murphy's refusal to answer the question being asked only bolsters Buck's argument that the FGMK Report was manufactured.

[114] Tr. Apr. 15 at 231:14-15.

[115] Tr. Apr. 16 at 64:20-66:18.

[116] The Court notes that while Defendants' Post-Trial Opening Brief devotes an entire fact section to the FGMK report, the Argument only makes two citations, in passing, regarding the FGMK report. *See* Holdco Post-Trial Opening at 35 ("one of FGMK's action plans was to build out Novus's internal controls"); *Id.* at 48 ("considering FGMK's 2018 letter, JX_44, to show a material monthly transaction volume in the AMR Account"). Although Buck pointed this fact out in his Opening Brief, Holdco made just *one* reference to the FGMK Report in its Reply Brief. ("Trial confirmed Thompson Coburn (and EY, FGMK and Grant Thornton)'s conclusions.") Holdco Post-Trial Answer at 33. For these reasons, the Court need not consider Buck's continuing objection to the FGMK Report because the Court is not relying upon it in its analysis.

The Court, therefore, finds that the FGMK report was "manufactured" and will not consider it for the definition of Cause.

## C.  Holdco did not prove by a preponderance of the evidence that Holdco terminated Buck for Cause.

### 1.  Standard for Cause

The Agreement defines Cause as:

(i) a Service Unitholder's material breach of any of the terms or representations contained in this Agreement or any Employment Agreement to which such Service Unitholder and the LLC, the Parent Company or the Operating Company are a party; (ii) such Service Unitholder's conviction of, or guilty plea or no contest plea to, any felony or criminal charge involving moral turpitude or that could reasonably be expected to have a significant adverse effect on the business or affairs of the LLC; (iii) such Service Unitholder's substantial and repeated failure, after written notice from the LLC, to perform duties (or refrain from actions) as reasonably directed by the LLC, the Parent Company or the Operating Company; (iv) such Service Unitholder's gross negligence, willful misconduct or breach of fiduciary duty with respect to any of the LLC, the Parent Company, the Operating Company and their Subsidiaries or their business relations that results (or could reasonably be expected to result) in a significant adverse effect on the business or affairs of the LLC, the Parent Company or the Operating Company; or (v) such Service Unitholder's commission of any material act of dishonesty, fraud, theft or embezzlement, or breach of fiduciary duty, against the LLC, the Parent Company, the Operating Company and their Subsidiaries or their business relations that results (or could reasonably be expected to result) in a significant adverse effect on the business or affairs of the LLC, the Parent Company or the Operating Company.[117]

---

[117] Am. Compl. Ex. A: Membership Agreement, Art. I [hereinafter "Agreement"].

The Court must determine, based on a preponderance of the evidence, whether Holdco's reasons for terminating Buck constituted "Cause" as defined above. Only the provisions (iii), (iv) and (v) of the Cause definition are at issue in this litigation.

Delaware law on contract interpretation is well-established. Delaware adheres to the objective theory of contracts, "*i.e.*, a contract's construction should be that which would be understood by an objective, reasonable third party."[118] When a contract is clear and unambiguous, a court will "give effect to the plain-meaning of the contract's terms and provisions."[119] To do so, the court will "construe the agreement as a whole, giving effect to all the provisions therein."[120] The interpretation must not "render any terms 'meaningless or illusory.'"[121]

A contract is ambiguous where "the provisions in controversy are reasonably or fairly susceptible to different interpretations."[122] If there is ambiguity the court will "look beyond the language of the contract to ascertain the parties' intentions."[123]

---

[118] *Salamone v. Gorman*, 106 A.3d 354, 367–68 (Del. 2014) (quoting *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010)) (internal quotation marks omitted).

[119] *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159–60 (Del. 2010) (citing *Rhone-Poulenc Basic Chem. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1195 (Del. 1992)).

[120] *GMG Cap. Inves., LLC v. Athenian Venture P'rs I, L.P.*, 36 A.3d 776, 779 (Del. 2012) (quoting *E.I. du Pont de Nemours & Co. v. Shell Oil Co.*, 498 A.2d 1108, 1113 (Del. 1985)) (internal quotation marks omitted).

[121] *Manti Hldgs., LLC v. Authentix Acq. Co.*, 261 A.3d 1199, 1208 (Del. 2021) (quoting *Osborn*, 991 A.2d at 1159).

[122] *Kuhn Constr., Inc. v. Diamond State Port Corp.*, 990 A.2d 393, 397 (Del. 2010) (quoting *Vanderbilt Income & growth Assoc., LLC v. Arvida/JMB Mgrs., Inc.*, 691 A.2d 609, 613 (Del. 1996) (internal quotation marks omitted).

[123] *In re Viking Pump, Inc.*, 148 A.3d 633, 648 (Del. 2016) (quoting *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del. 1997)) (internal quotation marks omitted).

If the contract is "plain and clear on its face, i.e., its language conveys an unmistakable meaning, the writing itself is the sole source for gaining an understanding of intent."[124] "When a term's definition is not altered or has no 'gloss' in the [relevant] industry it should be construed in accordance with its ordinary dictionary meaning."[125]

2. <u>Buck's actions do not constitute gross negligence or a breach of his fiduciary duties.</u>

a. *Case Law regarding Fiduciary Duties in Delaware*

The terms "gross negligence," "willful misconduct," or "breach of fiduciary duty" are not defined terms in the Agreement.[126] The Court will thus apply their plain meaning as defined by Delaware law.

"Gross negligence" is the "'extreme departure from the ordinary state of care' that signifies more than ordinary inadvertence or inattention.'"[127] It is "conduct that constitutes reckless indifference or actions that are without the bounds of reason."[128] To assess gross negligence, the court looks at "the reasonableness of a defendant's

---

[124] *Holifield v. XRI Inves. Hldgs., LLC*, 304 A.3d 896, 924 (Del. 2023) (quoting *City Investing Co. Liquidating Tr. v. Cont'l Cas. Co.*, 624 A.2d 1191, 1198 (Del. 1993)) (internal quotation marks omitted).

[125] *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 740 (Del. 2006) (quoting *USA Cable v. World Wrestling Fed'n. Entm't, Inc.*, 766 A.2d 462, 474 (Del. 2000)) (internal quotation marks omitted).

[126] *See generally* Agreement, art. I.

[127] *Hecksher v. Fairwinds Baptist Church, Inc.*, 115 A.3d 1187, 1199 (Del. 2015) (quoting *Brown v. United Water Del., Inc.*, 3 A.3d 272, 276 (Del. 2010); *Jardel Co. v. Hughes*, 523 A.2d 518, 530 (Del. 1987)).

[128] *McPadden v. Sidhu*, 964 A.2d 1262, 1274 (Del. Ch. 2008).

actions given the conditions at that time and not whether hindsight would shed more light upon whether any conditions could have served as red flags."[129] Gross negligence has been described by the Delaware Supreme Court as the "functional equivalent" of criminal negligence, "which is defined as the failure to perceive a risk of harm of such a nature and degree that the failure to perceive it constitutes a gross deviation from the standard of conduct a reasonable person would observe."[130] Finding gross negligence is a "necessarily fact-specific" endeavor.[131]

"Willful misconduct" is often used in the longer "willful and wanton misconduct" so for these purposes, the Court will consider case law using both phrases. "Willful and wanton misconduct is analogous to the conscious indifference or disregard for the rights of others and has commonly been referred to as the 'I don't care' attitude."[132] Whether conduct amounts to either gross negligence or willful or wanton conduct is a question for the fact finder.[133]

---

[129] *Greenfield as Next Friend for Ford v. Miles*, 211 A.3d 1087, 1101 (Del. 2019) (citing *McCaffrey v. City of Wilm.*, 133 A.3d 536, 550 (Del. 2016)).

[130] *Brown v. United Water Del., Inc.*, 2010 WL 2052373, at *4 (Del. Super. May 20, 2010) (citing *Jardel v. Hughes*, 523 A.2d 518, 530 (Del. 1987)).

[131] *Zucker v. Hassell*, 2016 WL 7011351, at *7 (Del. Ch. Nov. 2016) (citing *Espinoza on behalf of JPMorgan Chase & Co. v. Dimon*, 124 A.3d 33, 36 (Del. 2015)). Whether conduct amounts to gross negligence is a question for the fact-finder. *Brown v. United Water Del., Inc.*, 2010 WL 2052373, at *4 (Del. Super. May 20, 2010) (citing *Estate of Alberta Rae v. Murphy*, 2006 WL 1067277, at *3 (Del. Super. Apr. 19, 2006)).

[132] *Bristow v. Nemours Found.*, 2023 WL 4994093, at *6 (Del. Super. July 24, 2023) (quoting *Armstrong v. A.I. Dupont Hosp. for Children*, 60 A.3d 414, 418 (Del. Super. 2012)) (internal quotation marks omitted).

[133] *Brown v. United Water Del., Inc.*, 2010 WL 2052373, at *4 (Del. Super. May 20, 2010) (citing *Estate of Alberta*, 2006 WL 1067277, at *3).

Delaware law on breach of fiduciary duties is extensive and complex.  For the purposes of this case, the Court will only provide a very brief overview of the fiduciary duties disputed by the parties: the duty of loyalty and the duty of care.[134] Fiduciary duties "under Delaware law are 'unremitting,' meaning that they are always operative, but their application is context-dependent, meaning that the 'exact course of conduct that must be charted to properly discharge that responsibility will change in the specific context of the action the [fiduciary] is taking[.]"[135]

The duty of loyalty is broad.[136]  It "mandates that the best interest of the corporation and its shareholders takes precedence over any interest possessed by a director, officer or controlling shareholder and not shared by the stockholders generally."[137]  The duty requires the fiduciary to "subjectively seek to maximize the value of the [company] for the benefit of its stockholders."[138]  Breaches of the duty are found where in "cases involving self dealing [*sic*] or where a fiduciary puts personal interests ahead of the interests of its beneficiary."[139]

---

[134] Holdco Post-Trial Opening at 30–31; Buck Post-Trial Opening at 18–22.

[135] *In re Columbia Pipeline Grp., Inc. Merger Litig.*, 299 A.3d 393, 453 (Del. Ch. June 30, 2023) (citing *Malone v. Brincat*, 722 A.2d 5, 10 (Del. 1998)).

[136] *Gantler v. Stephens*, 965 A.2d 695, 713 n.52 (Del. 2009) (quoting *Solomon v. Armstrong*, 747 A.2d 1098, 1145–15 (Del. Ch. 1999), *aff'd*, 746 A.2d 277 (TABLE) (Del. 2000)).

[137] *Metro Storage Int'l LLC v. Harron*, 275 A.3d 810, 842 (Del. Ch. 2022) (quoting *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 361 (Del. 1993)) (internal quotation marks omitted).

[138] *McRitchie v. Zuckerberg*, 315 A.3d 518, 544 (Del. Ch. Apr. 30, 2024).

[139] *In re Orchard Enters., Inc. S'holder Litig.*, 88 A.3d 1, 38 (Del. Ch. 2014) (citing *Strassburger v. Earley*, 752 A.2d 557, 581 (Del. Ch. 2000)).

The duty of loyalty encompasses the duty of good faith.[140]  To act in good faith "[r]equires that the fiduciary subjectively believe that the course of action is in the best interests of the corporation and its stockholders."[141]  One may violate the duty of good faith if the fiduciary action "with a purpose other than that of advancing the best interests of the corporation, where the fiduciary acts with the intent to violate applicable positive law, or where the fiduciary intentionally fails to act in the face of a known duty to act, demonstrating a conscious disregard for his duties."[142]

> b.  *Buck did not act grossly negligent with respect to his practices with the AMR Account*

Holdco's main argument regarding Cause arises out of Buck's treatment of the AMR Account.  This argument is most reasonably attributed to the portion of the Lorenc Letter stating:

> [Mr. Buck's] claim that he was unaware of the $1.7 million write-off and reversal in 2017 until we confronted him with [it] in October 2019, raise significant concerns about Mr. Buck's diligence and competence. These actions may also constitute a breach of Mr. Buck's fiduciary duties as an officer of Novus.[143]

---

[140] *See, e.g.*, *Stone ex rel. AmSouth Bancorporation v. Ritter*, 911 A.2d 362, 369–70 (Del. 2006) (quoting *Guttman v. Huang*, 823 A.2d 492, 506 n.34 (Del. Ch. 2003) ("The failure to act in good faith may result in liability because the requirement to act in good faith 'is a subsidiary element[,]' i.e., a condition, 'of the fundamental duty of loyalty.'").
[141] *In re Columbia Pipeline*, 299 A.3d at 455 (Del. Ch. 2023) (citing *United Food & Com. Workers Union v. Zuckerberg*, 250 A.3d 862, 895 (Del. Ch. 2020), *aff'd*, 262 A.3d 1034 (Del. 2021)).
[142] *In re Walt Disney Co. Deriv. Litig.*, 906 A.2d 27, 67 (Del. 2006) (quoting *In re Walt Disney Co. Deriv. Litig.*, 907 A.2d 693, 756 (Del. Ch. Aug. 9, 2005)) (internal quotation marks omitted).  The duty of disclosure is not relevant to the assertions here.  Therefore, the Court will not address this duty.
[143] JX 81 at 2 (emphasis in original).

While the Lorenc Letter references that Buck's actions "may also constitute a breach of Mr. Buck's fiduciary duties," the only argument Holdco makes in its briefing is Buck "acted recklessly" in directing the AMR Account practices.[144] The Court interprets this as "gross negligence" because acting "recklessly" is not a defined term in the Cause definition.

At trial, Buck testified he directed the use of the AMR Account to aggregate and net unreconciled balances.[145] According to Holdco, this evidences that Buck acted recklessly because of his oversight of this account and alleged attempt to "distance himself from the Company's reconciliation issues."[146]

Holdco does not argue that Buck acted out of self-interest or engaged in self-dealing. Rather, Holdco argues that Buck's alleged mishandling of the AMR Account was "grossly negligent."[147] Although Holdco spends nearly eight pages in its Opening and Answering/Reply Post-Trial briefs arguing Buck's actions in

---

[144] Holdco also argues that Buck's alleged failure to implement written controls constitutes a breach of his fiduciary duties. *See* Holdco Post-Trial Answer at 8-9. This is a litigation driven argument. It does not appear in the termination script and is not reasonably incorporated into the Lorenc Letter. Therefore, the Court will not consider this as part of its analysis. In any event, this would not change the Court's analysis. As Dykstra credibly testified at trial, Novus had procedures in place, even if not in writing. Dykstra notes that having unwritten procedures is not unusual for a company the size of Novus. Tr. Apr. 15 at 77:13-23.

[145] Tr. Apr. 16 at 240:1-4. The Court notes that Defendant, in its post-trial briefing, relies upon deposition testimony of witnesses who testified at trial. If a deponent testifies at trial, the Court will rely only upon trial testimony. Of course, a witnesses' s credibility can be challenged through deposition testimony, but it is not appropriate to rely upon deposition testimony as affirmative evidence when the witness testifies live at trial.

[146] Holdco Post-Trial Opening at 31-35; Holdco Post-Trial Answer at 15-18.

[147] Holdco Post-Trial Opening at 31.

overseeing the AMR Account practices were "grossly negligent,"[148]  Holdco

provides no case law to support such a bold claim.  This is not surprising; the Court

is likewise unable to find a case with similar factual circumstances where an officer

is found to have acted with gross negligence.

The Court must look at Buck's conduct at the time of his termination, and not

a litigation-driven strategy employed to meet the definition of Cause.[149]  The

evidence at trial demonstrated that Buck, as CFO, delegated appropriate personnel

(including hiring outside consultants) to resolve the overall reconciliation issue,

regularly met with controllers (including Dykstra), and resolved this issue by

2018.[150]  Although Holdco spent a significant amount of time at trial regarding the

Grant Thornton audits, especially in light of the Whistleblower Letter, at the end of

the day, this proved nothing, certainly not gross negligence.  Grant Thornton never

issued anything other than unqualified audits with respect to the 2018 financials,

even after receiving the Whistleblower Letter and performing an investigation into

the AMR Account.  The Court finds it unlikely that Grant Thornton, a major

international accounting firm, would risk its professional reputation by not looking

---

[148] Holdco Post-Trial Opening at 31-35; Holdco Post-Trial Answer at 15-18.
[149] The Court notes most of the evidence at trial regarding the AMR Account was not included in the Lorenc Letter or the Termination Script.  Given the importance of this issue, the Court will consider the evidence related to Buck's treatment of the AMR Account; Cause still does not exist.
[150] Buck Post-Trial Opening at 28-29.

into the issue completely or by issuing an unqualified audit if one was not deserved.[151]

Although Defendant's expert, Schulman, testified that Buck's actions with the AMR Account was outside the bounds of reason and an "extreme departure from the standards and expectations as CFO in Buck's position,"[152] the Court does not credit Schulman's testimony on this topic. While the Court does not doubt Schulman's qualifications, he was the only witness at trial to testify to this point.[153] The Court credits the testimony of Buck and Buck's experts, Mark Roberts and Ralph Koch, who testified credibly regarding Buck's handling of the AMR Account.[154] Roberts noted that controllers – those in Dykstra's position – often want any sum on a company's books "immediately resolved," but that resolving everything immediately is not necessarily the right thing to do.[155] Roberts also testified that the use of a clearing account such as the AMR Account works when a finance department is faced with the reconciliation issues Novus faced, and that he had used

---

[151] *See Spotlighting the Nation's Top 500 CPA Firms*, INSIDE Public Accounting, https://insidepublicaccounting.com/ipa-top-500-firms/ (last visited Sept. 30, 2024) (listing Grant Thornton as the seventh largest accounting firm in the United States).

[152] Tr. Apr. 17 at 119:5-9.

[153] The Court also notes that this testimony comes close to providing an opinion on the ultimate outcome of the case, to which the Court needs no assistance. Dykstra, Novus' current Controller, took issue with respect to the fact that the AMR Account did not take the 2017 unreconciled balances into income, but refused to state that Buck's actions were "outside the bounds of reason." Tr. Apr. 15 at 13:13-16; 27:15-20; 79:1-19; 105:8-106:6.

[154] Tr. Apr. 17 at 40:13-41:14; 65:9-66:10; 166:8-167:22.

[155] Tr. Apr. 17 at 40:13-41:14.

such an account to solve similar problems before.[156] Koch testified that Buck's use of a clearing account was "exactly the right kind of thing to figure out what's the magnitude of [Novus'] problem," as well as how to resolve it.[157]

For these reasons, the Court finds that Holdco failed to prove, by a preponderance of the evidence, that Buck's practices with respect to the AMR Account were a gross deviation from the standard of conduct a reasonable person, and Holdco fails to meet the definition of Cause for this point.

> c. *Buck did not breach his fiduciary duty of loyalty with respect to Grant Thornton.*

Holdco's argument regarding Grant Thornton arises out of the following from the Lorenc Letter:

> An anonymous whistleblower letter received in April 2019 by Grant Thornton, Novus' independent auditors, noted that "an unqualified opinion on the financial statement should not be issued for the 2018 fiscal year." This letter alleges numerous accounting and financial problems, including that ***Mr. Buck approved entries to "bury part of the [unreconciled accounts] problem,"*** vendors are paid duplicate times ("Novus is out the $$, is clueless and has no idea what the $$ amount represents") and "Michael Buck is not engaged in the detail."[158]

---

[156] Tr. Apr. 17 at 65:9-66:10.

[157] Tr. Apr. 17 at 166:8-167:22.

[158] JX. 81 at 2 (emphasis added). Buck argues that the "dishonesty" issue was raised for the first time at trial, the Court disagrees. While true that Holdco appeared to be relying on a new prong of the Cause definition ("Such Unitholder's commission of any material act of dishonesty, . . ."), Holdco, it is post-trial briefing, abandoned this argument and instead focused on the breach of fiduciary duty prong for Cause.

Although much of Holdco's time at trial focused on Buck's use of the AMR Account (and whether it was proper to do so), the Court will only consider the following language from the Lorenc Letter for the Cause determination: "Mr. Buck approved entries to 'bury part of the [unreconciled accounts] problem.'" Holdco argues in its post-trial briefing that such actions amount to a breach of Buck's fiduciary duty of loyalty, citing *Hampshire Group, Ltd. v. Kuttner*.[159]

In *Kuttner*, two officers and employees of Hampshire Group, Ltd., Charles Clayton and Roger Clark, approved tuition payments to Columbia University as donations, when in fact they were tuition payments made on behalf of Hampshire's CEO, Ludwig Kuttner.[160] Clayton also knowingly caused the corporation to reimburse employees of a corporate subsidiary, Item-Eyes, Inc., and participated in an improper program "whereby sweaters without market value were doled out to particular employees, who gave them to charities and took personal tax deductions for the donation."[161] As CFO, Clayton certified Hampshire's annual reports with the SEC during the relevant time period, and Clark, as Principal Accounting Officer, signed sub-certifications.[162] The Court of Chancery held although none of the matters resulted in a "purposeful overstatement of Hampshire's earnings," the

---

[159] Holdco Post-Trial Opening at 41-46.
[160] *Hampshire Group, Ltd. v. Kuttner*, 2010 WL 2739995, at *3 (Del. Ch. July 12, 2010).
[161] *Id.* at *2.
[162] *Id.* at *33.

"conscious misstatement of the corporation's books and records" amounted to a "breach of the fiduciary duty of loyalty. . . to sign certifications or sub-certifications without disclosing to the Audit Committee what they knew about those issues."[163]

The issue the Court faces is that the Whistleblower Letter is hearsay; no one at trial could say with certainty the identity of its author. While multiple witnesses (including the parties' experts) testified at trial regarding Buck's use of the AMR Account, no one other than Buck has first-hand knowledge of whether he did (or did not) approve entries to "bury" the AMR Account problem.

The Court is hesitant to find a breach of a CFO's duty of loyalty based entirely on a hearsay document.[164] The Court will therefore consider some context from trial regarding Buck's use of the AMR Account and discussions with Grant Thornton. During trial, Buck testified credibly that Grant Thornton received a trial balance[165] in 2017,[166] and Grant Thornton had access to all accounts in Novus' systems.[167]

---

[163] *Id.* at *34. The Court further stated that "when a corporate officer is aware of financial misreporting that involves high-level management and that has evaded the corporation's auditors, and nonetheless certifies that he is not aware of any material weakness in the company's internal controls, he is making a false statement and failing to bring material information to the board, in breach of his duty of loyalty." *Id.*

[164] Again, the Court acknowledges the Whistleblower Letter is not being offered for the truth of the matter asserted. Out of all of the potentially hearsay documents, however, the Whistleblower Letter is the most difficult to ignore, given the anonymity of its author.

[165] A trial balance is a "listing of all of the accounts that a company has on its books." Tr. Apr. 17 at 9:14-15.

[166] *Id.* at 9:16-10:2.

[167] *Id.*

Koch,[168] Buck's professional standards expert, also testified credibly about what Grant Thornton would have had access to:

> Q. And what's your opinion of this allegation that somehow this AMR account or clearing account was concealed from [Grant Thornton] and they didn't know about it?
> A. I can't imagine how they would not know about it. Because at the beginning of their audit, they would have asked for the trial balance. And I mentioned before, this is the first time this company is reporting as a standalone enterprise. They going to give a lot of scrutiny to the first year balance sheet, to make sure that their opening balances are correct. So there's no way they would not have known about it."[169]

Similarly, Roberts, Buck's job performance expert, testified:

> Q. So focusing on the 2017 Grant Thornton audit have you seen any documentation or heard any testimony that indicates Mr. Buck hid information from Grant Thornton?
> A. No.
> Q. Even about that AMR account?
> A. No, it would be very difficult. It would be nearly impossible for him to hide it.
> Q. And was there anything about the information provided by Grant Thornton that indicated that he provided all of the information?
> A. Yes. [intentionally omitted remainder of response]
> * * *
> A. Sometimes this comes as a letter. Sometimes it comes as a presentation like this. One of the requirements in an audit - - and these are part of the SAS standard, a standard audit practice, that you have to have access - - that the CFO has to give you the access you request. And the data that you request. And if one of the reasons for a qualified opinion or perhaps even for the CPA audit firm to resign from the engagement would be if the management - - like anywhere in the organization, not just with the CFO - - i[t] refuses to allow the audit team to access the information that they think they need to validate the

---

[168] Koch has a B.S. in accounting, a M.S. with distinction and two concentrations, is a licensed CPA and a chartered financial analyst. Tr. Apr. 17 at 34:4-9.
[169] Tr. Apr. 17 at 175:6-20.

internal control processes or to substantiate balances, that would be a very severe problem and that would be noted in the columns they have responded to here.[170]

During trial, Buck – the only person at trial who could testify to the issue of what information Grant Thornton received – testified credibly that Grant Thornton was provided access to all of the information concerning the AMR Account.[171] Buck further testified that while he did not personally have discussions with Grant Thornton about how the AMR Account was being used, Grant Thornton received a copy of Novus' trial balance and general ledger and "[t]hey see every single account in it."[172] Thus, unlike in *Kuttner*, there is no evidence of a "conscious misstatement" of Novus's books and records.

For these reasons, the Court finds that Holdco did not prove, by a preponderance of the evidence that Buck intentionally deceived Grant Thornton regarding the use of the AMR Account.[173] Therefore, the Court does not find that

---

[170] Tr. Apr. 17 at 61:11-62:23.

[171] Tr. Apr. 16 at 305:18-20.

[172] *Id.* at 305:21-306:4. *See also* JX 33 at HOLDCO-217 (email chain between Buck and Murphy, where Buck confirms Grant Thornton was "aware" of the AMR Account). Holdco attempts to discredit Buck by inappropriately citing to his deposition testimony about who informed Grant Thornton about the use of the AMR Account. Holdco Post-Trial Opening at 41. When a witness is available at trial, it is inappropriate to rely on the witness' deposition testimony. Holdco then tries to point out Buck's equivocal response regarding Buck's discussions with Grant Thornton. *Id.* at 42. The Court does not discredit Buck's testimony at trial based on his inability to say who, exactly, had discussions with Grant Thornton about the AMR Account. As of the trial date, those discussions would have occurred approximately *six* years ago. The Court would be more surprised (and skeptical) if Buck was able to recall every single detail regarding the Grant Thornton audit.

[173] The Court notes that Holdco also references a reclassification chart from the E&Y Addendum regarding the use of the AMR Account. Holdco Post-Trial Answer at 30. Puzzlingly, Holdco did not question Buck about this chart at trial, and only questioned its expert, Schulman, about the

Buck breached his fiduciary duty of loyalty in connection with the Grant Thornton issue, and Holdco did not meet its burden regarding Cause.

### d. Buck did not act grossly negligent or breach his fiduciary duties with respect to Mai Lee.

Holdco argues Cause exists with respect to Mai Lee ("Lee") for two reasons: (1) Buck acted "outside the bounds of reason" and "ignored red flags" with Lee's departure and tasked Lee "with managing Novus's very first audit following the transaction with Omnicom;"[174] and (2) "Buck's failure to report Lee's concerns, and his election to 'investigate himself' instead, irrefutably constitutes a breach of his fiduciary duties of loyalty oversight and care."[175]  Neither argument meets the definition of Cause.

For someone who took center stage at the trial in this action, Lee was notably absent – Lee was not deposed, never responded to requests to be interviewed by

---

chart. Tr. Apr. 17 at 89:1-94:5.  In any event, without more context regarding the chart or hearing from Buck about it, the Court does not give this chart much weight in its analysis.

[174] Holdco Post-Trial Opening at 37.  While Buck argues that "the Court must disregard Holdco's argument that Buck acted outside the bounds of reason by assigning Lee to manage Novus's audit because this reason is manufactured," (Buck Post-Trial Opening at 33), the Court disagrees.  The Lorenc Letter discusses assigning "junior accounting people, often consultants and not employees, to functions inconsistent with their experience and role," and this argument reasonably flows from that point. JX 81 at 2. The Court similarly does not put much weight into Dykstra's testimony regarding this point.  While Dykstra testified that Grant Thornton seemed "surprised" when he told them about the AMR Account, much of his testimony concerned what *Grant Thornton* would have done in response to receiving the information about the AMR Account (assuming Grant Thornton did not already know about its existence).  Tr. Apr. 15 at 30:3-32:3.  Again, the only person (or entity) that could actually testify about this is Grant Thornton – and Grant Thornton did not appear in this case at trial.

[175] Holdco Post-Trial Opening at 38.

Thompson Colburn, and could not be compelled to testify at trial. Thus, the Court is left with testimony from other individuals within Novus about conversations they had with Lee, or conversations between other individuals about Lee.[176]

Holdco's first argument, that Buck acted "outside the bounds of reason," is measured by the gross negligence standard.[177] The Court will review the reasonableness of Buck's conduct at the time of his actions without the benefit of hindsight. Thus, the Court must determine, at the time Buck assigned Lee to Novus' audit in December 2017, it was a gross deviation from the standard of conduct a reasonable person would observe. The Court will ask the same with respect to Buck's alleged failure to report Lee's concerns about Company's accounting practices to Murphy.

The Court finds that Buck's decision to assign Lee to the audit in December 2017 did not amount to gross negligence. Holdco, in its Post-Trial Opening Brief states, without legal support, "Buck recklessly dumped on Lee handling Novus' first audit after just six weeks…without written internal controls."[178] This unsupported statement does not come close to meeting the burden of proving gross negligence by a preponderance of the evidence at trial. Holdco's failure to cite any case law is

---

[176] While no objection was made at trial regarding Lee's statements, the Court notes that most, if not all, of the testimony about what Lee said or did likely constitutes hearsay. Nonetheless, the Court will consider it for purposes of the merits of this case.

[177] *See infra* n. 128.

[178] Holdco Post-Trial Opening at 49.

telling.  Buck's actions in assigning Lee, an accounting professional with her CPA, to the Company's 2017 audit was not reckless (or even negligent).  Lee served as assistant controller at Novus from November 2017 to July 2018.[179]  Lee's qualifications (which presumably led to her hiring), made her the obvious choice to handle the audit.

In addition to not citing any case law to support this proposition, Holdco does not provide any guidance to the Court that assigning a certified public accountant to an audit is a gross deviation from the standard of care.  The only testimony at trial supporting this is Holdco's expert, Schulman, who testified as follows regarding Buck's assignment of the audit to Lee:

> [Buck] was not as involved in the audit that I think he should have been. In fact, he assigned an assistant, a new assistant controller, to be in charge of that audit.  And it was very complex because it was the first year of the audit.[180]

Instead of providing the Court with guidance on what Buck *should* have done with the audit or *who* he should have assigned to the audit, this statement proves nothing. Rather, the evidence at trial showed that it was not "outside the bounds of reason" for Buck to assign Lee to the audit.[181]  Novus' current controller, Dykstra, testified

---

[179] Tr. Apr. 16 at 231:20-232:9; 272:6-13.
[180] Tr. Apr. 17 at 86:18-23.
[181] On this point, the Court ponders the following: To whom should have Novus assigned to the audit? An individual in human resources with no accounting background?  A salesperson who has never seen a balance sheet in her life?  Holdco's argument on this point does not make sense.

it is "for sure" common for assistant controllers to work closely with auditors.[182] Buck's expert, Koch, testified credibly that Lee was "the right level to deal with the auditors and the audit process."[183] Koch further testified "it was reasonable and prudent to ask an assistant controller with a few weeks of experience with managing. . . that first time audit process," because Lee "was experienced and the testimony in this courtroom was that she was competent."[184]

Along these same lines, Buck did not breach his fiduciary duties or ignore red flags in connection with Lee's departure. Holdco claims Buck's failure to report Lee's purported concerns to Murphy along with Buck's "investigation" of Lee's departure breached his fiduciary duties. Again, Defendant fails to cite any case law to support this assertion. Holdco argues Buck's failure to report Lee's concerns to Murphy breached his "fiduciary duties of loyalty, oversight and care."[185] Holdco further insinuates that "of course" Lee would not disclose, to Buck, her purported ethical concerns about Buck to *him*.[186]

---

[182] Tr. Apr. 15 at 52:14-23.
[183] Tr. Apr. 17 at 193:8-17.
[184] *Id.*
[185] Holdco Post-Trial Opening at 38. While Holdco discusses the case law regarding fiduciary duties generally in its argument section, it does not specifically tie any case law to this assertion.
[186] Holdco cited two cases in its Reply Brief on this point, but the Court finds that it has waived this argument by not including it in its Opening Brief. Even so, these cases, *A & J Cap., Inc. v. L. Off. of Krug*, 2019 WL 367176, at *11 n.128 (Del. Ch. Jan. 29, 2019) and *Metro Storage Int'l LLC v. Harron*, 275 A.3d 810 (Del. Ch. 2022) do not further Holdco's argument. Holdco cites *Krug* for the proposition that "Krug could supplement his for-cause basis for removal with additional evidence or causes for termination discovered after removal." This quote leaves out the important caveat that the Court stated next that Krug "still was obliged to demonstrate that A & J had engaged in conduct, or failed to engage in conduct, at the time of removal that would satisfy the standards

Buck testified credibly at trial regarding the conversation he had with Lee regarding her departure.[187] The Court also notes that Lee, in her exit interview with Novus, did not cite any ethical concerns as a reason for her departure.[188] The only evidence at trial presented regarding Lee's ethical concerns arose out of an interview with Nadine Callahan during the Thompson Colburn investigation.[189] Lee did not respond to requests to be interviewed by Thompson Colburn.[190] This "second" or "third" hand information from Ms. Callahan (who also did not testify at trial) hardly can serve as a basis for a claim for the breach of the fiduciary duty of loyalty or care.[191] Therefore, the Court finds that Buck did not breach his fiduciary duties with Lee and Holdco does not meet the definition of Cause in the Agreement for this point.

---

for removal as laid out in the operative agreements." In any event, this quote merely lays out the standard for gross negligence but does nothing to support Holdco's argument regarding Lee. In *Metro Storage*, the Court discussed the "after-acquired evidence" doctrine. This is the first time Holdco raises this argument, and it is therefore waived. Even if the Court were to consider this argument, Novus's only argument in support of this point is the conclusionary sentence that "Buck does not get to benefit from his faithlessness towards Novus and Holdco." This proves nothing.

[187] Tr. Apr. 16 at 234:13-235:12.

[188] Tr. Apr. 16 at 39:18-41:13; *Compare* JX 15 with JX 27 at HOLDCO109.

[189] JX 27 at HOLDCO116, Tr. Apr. 16 at 269:4-271:18. Holdco's expert, Schulman, testified Buck "can't investigate [his] own department. You can't investigate yourself. It's absurd to me." Tr. Apr. 17 at 121:14-19. The Court does not credit Schulman on this point; his suggestion that Buck should have told these concerns to Murphy merely puppets Holdco's accusations and does not support a breach of fiduciary duty finding.

[190] JX 27 at HOLDCO109-HOLDCO110.

[191] D.R.E. 805 (hearsay within hearsay is admissible only if each layer conforms with an exception to the rule against hearsay); *See, e.g. Williams v. United Parcel Serv. of Am., Inc.*, 2017 WL 10620619 at *4 (Del. Super. Nov. 9, 2017) (concluding that plaintiff could not rely on hearsay within hearsay).

*e.    Buck did not breach his fiduciary duties in connection with the 2017 annual and interim financial statements.*

Holdco's final argument in support of its termination of Buck for Cause is that "[t]here can be no reasonable dispute that the reconciliation issues obscured in the AMR Account were material to Novus.[192] The Court struggles to understand *how* Defendant attempts to tie this issue to the Cause definition or *how* Buck breached his fiduciary duties to the Company. The Court also notes that no Company auditor ever found that the Company's financials were misstated; this was solely the opinion of the Company's current Controller, Dykstra.[193] The Court therefore does not find that this meets the definition of Cause.

3.    <u>Holdco did not demonstrate that Holdco provided Buck notice of Buck's duties to him</u>

The Holdco Agreement defines Cause to include: "such Service Unitholder's substantial and repeated failure, after written notice from the LLC, to perform duties (or refrain from actions) as reasonably directed by the LLC, the Parent Company, or the Operating Company."[194] The "LLC" is defined as "Viking Holding Management Company, LLC."

Holdco argues it meets this definition of Cause because Murphy, in his capacity as Manager of Holdco, provided Buck with a directive during his 2018

---

[192] Holdco Post-Trial Opening at 47.
[193] Tr. Apr. 15 at 58:2-59:13; JX 70.
[194] JX 18 at 2-3.

performance review.[195]  In support thereof, Holdco cites two documents as evidence of a "written notice" from Holdco: a 2017 performance review from Novus[196] and PowerPoint with handwritten notes (from Murphy) titled "CFO Roles and Responsibilities 2017 Evaluation Form."[197]  Holdco does not dispute that these are Novus documents, but argues this distinction does not matter because "Murphy at all relevant times acted as Novus' CEO *and* Manager of Holdco,"[198] and because "[t]here is no Viking Holding Company paperwork, letterhead, or anything."[199]

The Court does not find that either of these documents are written notice from Holdco.  "Delaware public policy disfavors disregarding the separate legal existence of business entities."[200]  Perhaps just as powerfully,

> The courts of this State hold freedom of contract in high—some might say, reverential—regard.  Only 'a strong showing that dishonoring [a] contract is required to vindicate a public policy interest even stronger than freedom of contract' will induce our courts to ignore unambiguous contractual undertakings."[201]

Here, Holdco argues both that the Court should enforce the Agreement's terms for the Cause definition but ignore the provision within the Cause definition

---

[195] Tr. Apr. 15 at 176:20-179:13; Tr. Apr. 16 at 105:7-109:9.
[196] JX 8.
[197] JX 9.
[198] Holdco Post-Trial Opening at 52 (emphasis in original).
[199] Tr. Apr. 16 at 108:17-18.
[200] *Manichaean Cap., LLC v. Exela Techs., Inc.*, 251 A.3d 694, 706 (Del. Ch. 2021) (internal citations and quotations omitted).
[201] *Cantor Fitzgerald, L.P. v. Ainslie*, 312 A.3d 674, 676-77 (Del. 2024) (*quoting ev3, Inc. v. Lesh*, 103 A.3d 179, 181 n.2 (Del. 2014)).

requiring "written notice from the LLC." The Court declines to do so and will enforce the Agreement as written. Holdco never provided Buck written notice of his duties; therefore, Holdco did not meet its burden at trial regarding his provision of the Cause definition.[202]

## D.    Buck Proved his Damages Claim by a Preponderance of the Evidence.

All elements of a claim must be proven by a preponderance of the evidence, including the plaintiff's damages.[203] The most common way to prove damages, especially in cases where the court has to determine fair market value, is to provide a damages expert to testify on the proper framework for a valuation analysis.[204] A party, however, can also direct the court to other evidence, including documentary evidence to demonstrate damages[205] or can consider fact witnesses testimony."[206]

---

[202] The Court further notes that, in the Summary Judgment opinion, the Court expressed skepticism about the performance reviews being "written notice" at all. Mem. Order Den. Summ. J. at 16. ("Based on the record, the 2018 performance review may have been just that—a performance review."). Holdco did not provide any evidence at trial to change the Court's mind that Buck's performance reviews with Novus were just that—performance reviews.

[203] *See, e.g.*, *Outbox Sys., Inc. v. Trimble, Inc.*, 2024 WL 1886089, at *14 (Del. Super. Apr. 30, 2024) (quoting *Beard Rsch., Inc. v. Kates*, 8 A.3d 573, 613 (Del. Ch. Apr. 23, 2010)).

[204] *See e.g.*, *In re Rural Metro Corp.*, 88 A.3d 54, 107 (Del. Ch. Mar. 7, 2014) (finding the valuation expert provided "persuasive evidence of fair value and adopts it as the general framework for the valuation analysis").

[205] *See e.g.*, *Beard Rsch., Inc. v. Kates*, 8 A.3d 573, 612 (Del. Ch. 23, 2010) (relying on company reports presented by both sides); *NetApp Inc. v. Cinelli*, 2023 WL 4925910, at *20 (Del. Ch. Aug. 2, 2023) (noting "each position is supported by an expert opinion").

[206] *Empire Fin'l Servs., Inc. v. Bank of New York (Del.)*, 945 A.2d 1167 (TABLE), 2008 WL 727036, at *2 (Del. 2008) (affirming a decision to exclude an expert witness, and noting even without the expert, other evidence at trial supports the other sides' damages argument).

In complex cases with valuation issues, the Court is often guided by the "battle of the experts," where each side provides a damages expert (with a corresponding expert report), and that expert testifies at trial and is subject to cross examination.[207] That being said, "[t]he law does not require certainty in the award of damages.[208] "[S]o long as a plaintiff provides a reasonable method to calculate damages, the risk that such cannot be determined with mathematical certitude falls on the wrongdoer, not the wronged."[209] The Court, however, "when acting as the fact finder . . . may not set damages based on mere 'speculation or conjecture' where the plaintiff fails to adequately prove damages."[210]

### 1. The Standard for FMV under the Agreement

The Agreement defines "Fair Market Value" as "with respect to any asset or equity interest, its fair market value determined according to Article XIII."[211] Section 9.10(b) clarifies that the "Fair Market Value of any Unit for purposes of this Section 9.10 shall be determined as of the closing date set forth in the Repurchase

---

[207] *See, e.g.*, *Maverick Therapeutics, Inc. v. Harpoon Therapeutics, Inc.*, 2021 WL 1592473, at *1 (Del. Ch. Apr. 23, 2021) (noting that each side's expert provided conflicting conclusions).

[208] *Reis v. Hazelett Strip-Casting Corp.*, 28 A.3d 442, 466 (Del. Ch. Jan. 21, 2011) (quoting *Red Sail Easter Ltd. P'rs v. Radio City Music Hall Prods., Inc.*, 1992 WL 251380, at *7 (Del. Ch. Sept. 29, 1992)) (internal quotation marks omitted).

[209] *Maverick Therapeutics, Inc. v. Harpoon Therapeutics, Inc.*, 2021 WL 1592473, at *10 (Del. Ch. Apr. 23, 2021) (quoting *Great Hill Equity P'rs IV, LP v. SIG Growth Equity Fund I, LLLP*, 2020 WL 948513, at *20 (Del. Ch. Feb. 27, 2020) (internal quotation marks omitted).

[210] *Beard Research, Inc. v. Kates*, 8 A.3d 573, 613 (Del. Ch. Apr. 23, 2010) (quoting *Medek v. Medek*, 2009 WL 2005365, at *12 n. 78 (Del. Ch. July 1, 2009)).

[211] Agreement, art. I.

Notice delivered pursuant to Section 9.10(c)."[212]   Article XIII details how to value

units, noting:

> The "Fair Market Value" of each Unit shall be the fair value of each
> such Unit determined by the Board in good faith based on the portion
> of the Total Equity Value to which each such Unit would be entitled as
> of the date of valuation; provided, however that in the case of any Class
> B Units or Class C Units being repurchased pursuant to the Repurchase
> Option, the Fair Market Value of all Units owned by such Service
> Unitholder shall only include the Fair Market Value of those Units
> which have had restrictions lapse pursuant to Section 3.9 . [sic][213]

Article I defines "Total Equity Value," as used in the Fair Market Value calculation,

as follows:

> "Total Equity Value" means the aggregate proceeds which would be
> received by the Unitholders if: (i) the assets of the LLC[214]  were sold at
> their Fair Market Value, (ii) the LLC satisfied and paid in full all of its
> obligations and liabilities (including all Taxes, costs and expenses
> incurred in connection with such transaction and any reserves
> established by the Board for contingent liabilities) and (iii) such net sale
> proceeds were then distributed in accordance with Section 12.2(c), all
> as determined by the Board in good faith.[215]

As referenced in the definition of Total Equity Value, Section 12.2(c) provides for

the distribution of sales proceeds:

> Distribution of Liquidation Assets. As soon as the Liquidation FMV
> and the proper amounts of Distributions have been determined in
> accordance with Section 12.2(b) above, the liquidators shall promptly
> distribute the Liquidation Assets to the holders of Units in accordance
> with Section 4.1(c) above.  In making such distributions, the liquidators

---

[212] Agreement § 9.10(b) (emphasis in original).
[213] Agreement, art. XIII (emphasis in original).
[214] The "LLC" is defined in the Agreement as Viking Holding Management LLC (referred to in this opinion as "Holdco.").
[215] Agreement, art. I.

shall allocate each type of Liquidation Assets (i.e., cash or cash equivalents, preferred or common equity securities, etc.) among the Unitholders ratably based upon the aggregate amounts to be distributed with respect to the Units held by each such holder; provided that the liquidators may allocate each type of Liquidation Assets so as to give effect to and take into account the relative priorities of the different Units pursuant to Article IV; provided further that, in the event that any securities are part of the Liquidation Assets, each Unitholder that is not an "accredited investor" as such term is defined under the Securities Act may, in the sole discretion of the Board, receive, and hereby agrees to accept, in lieu of such securities, cash consideration with an equivalent value to such securities as determined by the Board. Any non-cash Liquidation Assets will first be written up or down to their Fair Market Value, thus creating Profit or Loss (if any), which shall be allocated in accordance with Sections 4.2 and 4.3. The distribution of cash and/or property to a Unitholder in accordance with the provisions of this Section 12.2 constitutes a complete return to the Unitholder of its Capital Contributions and a complete distribution to the Unitholder of its interest in the LLC and all the LLC property and constitutes a compromise to which all Unitholders have consented within the meaning of the Delaware Act. To the extent that a Unitholder returns funds to the LLC, it has no claim against any other Unitholder for those funds.[216]

The above clause refers to "Liquidation FMV" and "Liquidation Assets," as defined

in Section 12.2(b):

Determination Liquidation Assets. As promptly as practicable after dissolution, the liquidators shall (i) determine the Fair Market Value (the "Liquidation FMV") of the LLC's remaining assets (the "Liquidation Assets") in accordance with Article XIII hereof, (ii) determine the amounts to be distributed to each Unitholder in accordance with Section 12.2(c), and (iii) deliver to each Unitholder a statement (the "Liquidation Statement") setting forth the Liquidation FMV and the amounts and recipients of such Distributions, which Liquidation Statement shall be final and binding on all Unitholders.[217]

---

[216] Agreement, § 12.2(c) (emphasis in original).
[217] Agreement, § 12.2(b) (emphasis in original).

## 2. Keath's report provides guidance to the Court regarding Fair Market Value, but the Court does not credit his opinion in its entirety.

Holdco was the only party to submit a damages expert report in this action. Holdco's damages expert, M. Travis Keath, completed an expert report in which he determined the value of Buck's 100 Class B Holdco Membership Units.[218] Keath described the contents of his expert report in his testimony at trial.[219] Keath, in his expert report, analyzed the fair market value of Buck's 100 Class B Units assuming termination without Cause and determined the value to be $5,334,288[220]:

**Figure 7: Fair Market Value per Holdco Agreement of Mr. Buck's 100 Class B Units Assuming Termination Without Cause**

| $ in thousands, except unit-based figures | | | Source |
|---|---|---|---|
| Enterprise Value, on a Marketable Minority Interest Basis (1) | | $ 36,000 | NOVUS0051 |
| (+) Cash and Cash Equivalent | | 29,879 | NOVUS0051 |
| (-) Interest-Bearing Debt | | (1,726) | NOVUS0051 |
| (-) Present Value of Omnicom License Fee (1) | | (10,142) | NOVUS0051 |
| (-) Omnicom Initial Capital | | (12,000) | Viking Parent LLC Agreement |
| (-) Taxes | | - | |
| (-) Estimated Transaction Costs and Expenses (2) | 2.2% | (792) | VALUE Incorporated Estimate |
| (-) Reserve for Contingent Liabilities | | - | |
| Total Additions and Deductions | | 5,220 | |
| Implied Total Equity Value, on a Marketable Minority Interest Basis | | 41,220 | |
| (-) Discount for Lack of Marketability | 17.5% | (7,213) | NOVUS0085 |
| Implied Total Equity Value on Non-Marketable Minority Interest Basis | | 34,006 | |
| Ownership Interest of Holdco | 80.0% | $ 27,205 | |
| Class C Unit Participation Threshold Met? (3) | 48,118 | No | HOLDCO-981 |
| Aggregate Proceeds to be Received by All Holdco Unitholders | | $ 27,205 | |
| Total Class A and Class B Units Outstanding (3) | | 510 | NOVUS0029 |
| Fair Market Value per Unit (3) | | $ 53,342.88 | |
| No. of Class B Units Owned by Mr. Buck | | 100 | HOLDCO-981 |
| **Fair Market Value of Mr. Buck's 100 Units - Assuming Termination Without Cause** | | **$ 5,334,288** | |

Sources: Viking Holding Management Company, LLC Valuation Analysis as of April 1, 2020, prepared by Houlihan Lokey dated August 6, 2020
Viking Holding Management Company, LLC Amended and Restated Limited Liability Company Agreement
Limited Liability Company Agreement of Viking Parent LLC and Amendment No. 1 thereto
Pyka Deposition Exhibits 2 and 3
Notes:
(1) Midpoint of indications determined in the HL Report.
(2) Estimated based on median of observed transaction costs in deals of comparable size.
(3) Because the Participation Threshold of $48.118 million was not met, Class C Unitholders would not eligible to participate.

---

[218] Agreement, § 12.2(b) (emphasis in original).
[219] Tr. Apr. 17 at 224:16-306:22.
[220] JX 99 at 19.

Keath alternatively calculated damages assuming Buck's tax distributions of $2.08 million were treated as advances, as Holdco argues is required by Agreement. After doing so, Keath's revised calculation amounted to $3,250,000[221]:

**Figure 9: Alternative Calculation of Economic Damages Assuming Cumulative Tax Distributions are Treated as Advances**

| | | Source |
|---|---|---|
| Fair Market Value of Mr. Buck's 100 Units - Assuming Termination Without Cause | $ 5,334,288 | |
| Less: Tax Distributions to Mr. Buck Treated as Advances | (2,080,703) | HOLDCO-980 |
| Alternative Economic Damages to Mr. Buck - Assuming Termination Without Cause | $ 3,253,585 | |

Sources: Figures 7 and 8 herein
Pyka Deposition Exhibit 2

Buck failed to present an expert valuation to support his requested damage award.[222] In Buck's post-trial briefing, Buck agrees with much of Keath's valuation methodology. [223] Three main points of contention remain for the Court to decide: (1) Keath's use of midpoints of certain ranges provided in April 1, 2020 Houlihan Lokey Valuation;[224] (2) Keath's $12 million deduction with respect to Omnicom's initial capital contribution; and (3) Keath's deductions for tax distributions to Buck.

---

[221] JX 99 at 21.

[222] Holdco argues Buck was required to have an expert to challenge any of Keath's determination, and, without one, the Court cannot consider any of Buck's challenges to Keath's Fair Market Value determination. Holdco Post-Trial Answer at 42. While such expert would have been helpful to the Court, the Court does not need the help of an expert to read the Agreement and determine the requirements for Fair Market Value.

[223] D.I. 279, at 52. "Plaintiff does not dispute the legitimacy of many of the inputs utilized in the April 1, 2020 Valuation, and subsequently by Mr. Keath." As Buck noted, Keath made four main changes from the April 1, 2020 Valuation in arriving at his conclusion as to the Fair Market Value of Buck's units. Buck does not challenge Keath's disregard of Class C Unitholders' profit interest or his application of a 2.2% transaction cost.

[224] After Buck's termination, on August 6, 2020, Houlihan Lokey finalized another valuation analysis on August 6, 2020, with an effective date of April 1, 2020 ("April 1, 2020 Valuation"). JX 82. At the time of Buck's termination, Holdco had only formally assessed the Fair Market Value of units of Holdco on one prior occasion, a January 1, 2019 valuation analysis published on July 17, 2019. JX 25.

As noted in the second figure above, when Keath made these adjustments, Keath found the Fair Market Value of Buck's units to be $3,253,585. The Court reviews each of Buck's challenges in turn.

3.    Keath's Use of Midpoint Ranges Was Appropriate.

Buck challenges Keath's use of the midpoint ($36 million) of the range provided in the April 1, 2020 Valuation for the Implied Enterprise Value ($32 to $40 million).[225] Buck argues the "gross revenue projections were significantly less for the April 1, 2020 Valuation in comparison to the previous valuations, despite those previous valuations occurring just 15 months (January 1, 2019 Valuation) and 5 months (November 1, 2019 Valuation), earlier."[226] In challenging Keath's use of the midpoint, Buck largely relies upon his own experience in working for Novus on April 1, 2020, the effective date of the April 1, 2020 Valuation, and his familiarity

---

[225] Buck Post-Trial Opening at 54.

[226] Buck Post-Trial Opening at 55. Keath's expert report notes the purpose for Houlihan Lokey's Valuation Analysis as of April 1, 2020. JX 99 at ¶37 (quoting JX 82 at NOVUS0017 "We understand that our conclusions may (i) be used to assist the Company in connection with its evaluation of the possible repurchase of Class B units in accordance with the Viking Limited Liability Company Agreement (the "Transaction") and (ii) serve as a valuation basis for tax and financial reporting purposes in connection with a potential grant of Class C profit participation interests of the Company."). *See also* JX 54 at HOLDCO-274 ("We understand that our conclusions may (i) be used to assist the Company in connection with its evaluation of the possible repurchase of Class B units (the "Transaction") and (ii) serve as a valuation basis for tax and financial reporting purposes in connection with a potential grant of profit participation interests in the Company. This Report may not be used for any other purpose."); JX 25 at NOVUS-0147 ("We understand that our conclusions may serve as a valuation basis for tax reporting purposes in connection with certain grants of Class C Units of the Company. This Report may not be used for any other purpose.").

with Novus's projections at the time.[227]   Thus, Buck argues, the most appropriate Implied Enterprise value is the high point of the stated range of the April 1, 2020 Valuation, or $40 million.

The Court finds Buck did not meet his burden in rebutting Keath's use of the midpoint range.   The Court does not believe, as Holdco argues, Buck was "masquerading an expert" in offering his testimony regarding the value of Holdco.[228] Rather, the Court does not credit Buck's argument regarding using the high point of the valuation because he provides no other support for his assertion, other than his own "say so."  If Buck had retained his own affirmative damages expert, such expert could have provided sufficient evidence to the Court regarding why the Court should accept the high point of the valuation or provided a different valuation altogether. He did not.  The Court, after weighing the credibility of Keath, finds that Keath reasonably used the midpoint based on an "effort to favor neither Mr. Buck nor the Company."[229]

4.     Keath improperly deducted the $12 million Omnicom initial capital in arriving at the Fair Market Value of Buck's Units.

Buck argues that Holdco's deduction of the $12 million initial capital from Omnicom is not supported by the Agreement because: (1) such a deduction is referenced in an amendment to the Viking Parent LLC Agreement, *not* the Holdco

---

[227] Buck Post-Trial Opening at 55.
[228] Holdco Post-Trial Answer at 43.
[229] Tr. Apr. 17 at 254:6-8.

Agreement; and (2) even if the Viking Parent LLC Agreement applied, such deduction would only applies upon an actual dissolution and appointment of a liquidating trustee.[230]

The Court finds, through the proper reading of the Agreement, that Keath properly considered a liquidation event for determination of Fair Market Value, but that Keath improperly deducted the $12 million Omnicom initial capital.

First, the definition of Fair Market Value is governed by Article VIII of the Agreement. The definition of Fair Market Value expressly includes Total Equity Value, a defined term in the Agreement. Thus, the Court must consider the definition of Total Equity Value, which contemplates a valuation *as if* there were a liquidation event in accordance with Agreement Section 12.2(c).

Buck's interpretation of the Agreement reads out the language of Total Equity Value within the definition of Fair Market Value in the Agreement. The Court declines this invitation. Rather, the Court interprets this provision as merely a mechanism for valuation, not that a liquidation event had to actually occur to determine Total Equity Value.

Second, the Court finds Keath improperly deducted the $12 million Omnicom initial capital. Again, Total Equity Value is defined as "the aggregate proceeds which would be received by the Unitholders if: (i) the assets of the LLC were sold at their

---

[230] Buck Post-Trial Opening at 58.

Fair Market Value, (ii) the LLC satisfied and paid in full all of its obligations and liabilities." The LLC is defined as Holdco. The only support Holdco (and Keath) provide for a deduction of the $12 million initial capital is from the *Viking Parent LLC Agreement*, not the Holdco Agreement.[231]

Keath acknowledges the April 2020 Houlihan Lokey report did not account for the Omnicom $12 million but argues this is "an apparent oversight."[232] In doing so, Keath cites to the Viking Parent LLC Agreement, Section 9.2, regarding Liquidation of Viking Parent LLC:

> Section 9.2 Liquidation. Upon dissolution of the Company,[233] the Managers shall appoint a Manager as liquidating trustee, who shall immediately commence to wind up the Company's affairs; provided, however, that a reasonable time shall be allowed for the orderly liquidation of the assets of the Company and the satisfaction of liabilities to creditors so as to enable the Members to minimize the normal losses attendant upon a liquidation. The liquidating trustee shall first make payment or provision for all debts and liabilities of the Company, if determined to be necessary under the circumstances by the Managers. The proceeds of liquidation shall be distributed, as realized, in the manner provided in the Act, in accordance with the positive balances in the Capital Accounts of the Members; provided that Seller Member shall receive first, to the extent of all amounts otherwise distributable to the Members, an amount equal to the Seller Member's Initial Capital Account Balance (as defined in Section 13. l)…[234]

---

[231] *See* JX 99 (citing "Viking Parent LLC Agreement" as support for the $12 million deduction).
[232] JX 99 at ¶30.
[233] "Company" is defined as Viking Parent LLC.
[234] JX 3 at § 9.2.

The "Seller Member" is identified as Omnicom in the Viking Parent LLC Agreement and identifies the $12 million in Omnicom's initial account balance.[235]

Neither Holdco nor Keath cite to any provision of the Agreement for its support, nor could they. The $12 million initial capital is an obligation or liability of Viking Parent LLC, *not* Holdco.[236] Holdco's citation to Anthony Pyka's[237] deposition testimony is also not helpful; when Pyka testified as to the deduction of the $12 million, Pyka was also referring to the provisions in the Viking Parent LLC Agreement, *not* the Holdco Agreement.[238]

Holdco relies upon Section 12.2's good faith language to save the day the Court likewise rejects this argument. The April 2020 Houlihan Lokey Report sat unchanged for over three years, including during the pendency of this litigation. The first time Holdco determined the $12 million Omnicom initial capital should be deducted was in Keath's expert report, prepared in anticipation for trial.[239] If Holdco's board (consisting solely of Murphy)[240] believed in good faith that the April

---

[235] JX 3 at HOLDCO-983, HOLDCO-1022.
[236] Even Keath testified at trial that the initial capital is not a "debt," but rather it is similar to preferred stock. Tr. Apr. 17 at 297:9-12.
[237] Pyka, an employee at Grant Thornton, is responsible for maintaining Holdco's capital accounts. JX 93 at 7:3-7.
[238] JX 93 at 54:15-58:15.
[239] Although Murphy testified at trial that "error" regarding $12 million was discovered after Buck's termination (Tr. Apr. 15 at 258:21-22), Holdco provides no other evidence regarding this statement. The Court does not credit Murphy's self-serving statement on this issue.
[240] Tr. Apr. 15 at 156:18-20.

2020 Houlihan Lokey report was incorrect, a change should have been made prior to August 2023.[241]

5. <u>Buck's tax distributions are not deductible from the Fair Market Value.</u>

From 2017 through 2020, Buck received four tax distributions totaling $2,080,703.[242] Holdco argues, based on Section 4.1(a) of the Agreement, that these tax distributions must be deducted from the Fair Market Value Calculation.

Again, the Court looks to the plain and unambiguous terms of the Agreement as guidance. Total Equity Value, as defined by the Agreement, provides:

> [T]he aggregate proceeds which would be received by the Unitholders if: (i) the assets of the LLC were sold at their Fair Market Value, (ii) the LLC satisfied and paid in full all of its obligations and liabilities (including all Taxes, costs and expenses *incurred in connection with such transaction* and any reserves established by the Board for continent liabilities) and (iii) such net sale proceeds were then distributed in accordance with Section 12.2(c), all as determined by the Board in good faith.[243]

Section 12.2(c) provides, in relevant part:

> <u>Distribution of Liquidation Assets</u>. *As soon as the Liquidation FMV and the proper amounts of Distributions have been determined in accordance with Section 12.2(b) above*, the liquidators shall promptly distribute the Liquidation Assets to the holders of Units in accordance with Section 4.1(c) above. In making such distributions, the liquidators shall allocate each type of Liquidation Assets (i.e., cash or cash equivalents, preferred or common equity securities, etc.) among the

---

[241] Because the Court finds that the $12 million Omnicom Initial Capital was improperly deducted, Buck's argument regarding his entitlement to the value of his capital accounts is moot. *See* Buck Post-Trial Reply at 17-19.

[242] JX 99 at 20.

[243] JX 18 at Art. I, Definitions (emphasis added).

Unitholders ratably based upon the aggregate amounts to be distributed with respect to the Units held by each such holder; provided that the liquidators may allocate each type of Liquidation Assets so as to give effect to and take into account the relative priorities of the different Units pursuant to Article IV. . .[244]

Section 4.1(c) provides:

Distributions of Sale Proceeds and Liquidation Assets. Except as otherwise set forth in Section 4.1(a), the Board shall distribute the Sale Proceeds and, pursuant to Section 12.2(c), the liquidators shall distribute the Liquidation Assets, in each case, to the holders of Class A Units, Class B Units and Class C Units ratably among such holders based upon the proportion that the number of Class A Units, Class B Units and Class C Units are held by each such holder immediately prior to such Distribution bears to the aggregate number of Class A Units, Class B Units and Class C Units then outstanding; provided, however, that the holders of Class C Units subject to a Participation Threshold shall not be entitled to receive any distributions pursuant to this Section 4.1(c) in respect of their Class C Units unless and until the aggregate distributions by the LLC in respect of all Units entitled to distributions pursuant to this Section 4.1(c) (other than distributions in respect of Class C Units with higher Participation Thresholds) from the date of the issuance of such Units equal the Participation Threshold applicable to such Units. After the holder of all other Units have received distributions pursuant to this Section 4.1(c) equal to the applicable Participation Threshold, such holders of Class C Units subject to the applicable Participation Threshold shall be entitled to receive distributions in accordance with this Section 4.1(c) without regard to this proviso.[245]

Finally, Section 4.1(a) provides:

Tax Distributions. Subject to the second sentence of this Section 4.1(a), the LLC may, in the Board's discretion, distribute to each Unitholder within 30 days after the end of each Fiscal Quarter an amount in cash (a "Tax Distribution") which in the good faith judgment of the Board

---

[244] JX 18 (emphasis added).
[245] JX 18 at § 4.1(c).

equals the product of (i) the taxable income of the LLC estimated to be allocated to such Unitholder during such Fiscal Quarter (and taking into account, in the Board's discretion, such Unitholder's allocable share of any taxable losses that may be realized by the LLC after such Fiscal Quarter) reduced by the taxable loss of the LLC for all prior Fiscal Quarters allocated to such Unitholder and not previously taken into account for purposes of this Section 4.1(a); multiplied by (ii) the greater of (A) 40% or (B) the combined maximum federal, state and local income Tax rate to which any Unitholder (or its owners) may be subject to tax (including any Medicare Tax imposed under Section 1411 of the Code) and taking into account the deductibility of state and municipal income tax for federal income tax purposes) for such period (making an appropriate adjustment for any rate changes that take place during such period). Tax Distributions shall be made ratably among the Unitholders based on the portion of the net Taxable Income of the LLC for such Fiscal Quarter estimated to be allocated to each such Unitholder. Distributions made pursuant to Section 4.1(b) or Section 4.1(c) shall serve to discharge the LLC's obligations under this Section 4.1(a) to the extent such Distributions are actually paid. No Tax Distribution shall be made to any Unitholder with respect to a Fiscal Quarter or Fiscal Year (1) in which a Sale Transaction is consummated and the Sale Proceeds are distributed to the Members in accordance with Section 4.1(c) or (2) the LLC is liquidated in accordance with Article XII and the Liquidation Assets are distributed to the Members in accordance with Section 12.2(c). Notwithstanding anything herein to the contrary, (x) no Tax Distribution pursuant to this Section 4.1(a) shall reduce the Participation Threshold and (y) the amount of Tax Distributions received by a Member pursuant to this Section 4.1(a) *shall be treated as an advance* on amounts otherwise distributable under Section 4.1(b) and Section 4.1(c).[246]

In a nutshell, Holdco argues that, because Buck already received his tax distributions ("as an advance") pursuant to Section 4.1(a), this amount must be deducted from Fair Market Value. Holdco's argument is based on a misreading of

---

[246] *Id.* at § 4.1(a)(emphasis added).

Sections 4.1 and 12.2 of the Agreement. Section 4.1(a) is not referenced in any provision regarding how to calculate Fair Market Value; rather, Section 4.1(a) is only referenced in Section 12.2(c) when referring to the procedure by which sale proceeds will be distributed. As the first sentence of Section 12.2(c) indicates, only after the "Liquidation FMV" is determined does Section 4.1(c) regarding distributions apply. Here, the Court is tasked solely with determining Fair Market Value, and thus need not reach the provisions of Section 4.1.

Keath's expert report recognizes this exact circumstance. Notably, Keath does not independently state that the tax distributions should be deducted from the Fair Market Value, and, in his initial valuation of Fair Market Value, Keath does not make a deduction for tax distributions.[247] Keath only incorporates an "Alternative Economic Damages Calculation" after acknowledging "Holdco has requested that I perform an alternative calculation of damages reflecting the deduction of the cumulative tax distributions received by Mr. Buck."[248] During trial, Keath testified he had no opinion regarding the treatment of Buck's tax distributions, but only performed the analysis because he understood there was a "legal dispute" about it, and refused to state, one way or the other, whether he believed the taxes should be deducted.[249]

---

[247] JX 99 at Figure 7.
[248] JX 99 at ¶ 47.
[249] Tr. Apr. 17 at 263:2-266:13.

Pyka, when provided with the chart of each Unitholder's capital account at his deposition, confirmed this to be the case:

Q. Okay, and so essentially as of 12/31/2018, this spreadsheet reflects that the fair market value of Viking Holding Management Company was 48 million and change?
A. At this moment in time, that's correct.
Q. And so in the event of a liquidation at that moment in time, can you describe to me what Michael Buck would be entitled to based on this?
A. Yeah. If the company sold at that moment in time for 48 million, Michael Buck would presumably be entitled to the $8 million in the capital account.
Q. And can you – do we need to account for the tax distributions or anything like that, or is that total, or are there deductions that would be – need to be made as well?
A. I believe the 48 million assumes that now that's the equity value, so that assumes that all – that's what's left after all creditor's expenses and all that other stuff.
Q. Sure. Because we've already deducted those tax distributions; correct?
A. That's right. They are advances, so they're already – they've already reduced the capital when they left.
Q. And his equity, essentially.
A. Yes.
Q. Okay, So is it fair to say if there as a dissolution or – you know, they sold all their assets as of 12/31/18, that Michael Buck would have been titled to about $8 million?
A. Based on that value, yes.[250]

The Court holds, pursuant to the Agreement, that Buck's tax distributions are not deductible from Fair Market Value. When the provisions referenced above are read together, the determination of Fair Market Value is based on the Total Equity Value of each Unit as of the date of valuation (here, April 1, 2020). Likewise, Total

---

[250] JX 93 at 78:2-79:23, referencing JX 113.

Equity Value makes no reference of tax distributions,[251] only Holdco's obligations and liabilities, including taxes in connection with the *transaction* i.e., the liquidation, not personal not tax distributions.

## IV.    CONCLUSION

The Court finds as follows:

1.    Buck proved, by a preponderance of the evidence, that reasons two and four from Holdco's Opening Brief, along with the FGMK Report, were manufactured and the Court did not consider those reasons for the determination of Cause pursuant to the Agreement;

2.    Holdco failed to prove by a preponderance of the evidence that the remaining reasons in Holdco's Opening Brief met the definition of Cause;

3.    Keath appropriately used the midpoint of $36,000 from the Houlihan Lokey Report for his Fair Market Value analysis;

4.    The $12 million Omnicom Initial Capital should not be included in the Fair Market Value Analysis;

5.    Buck's tax distributions should not be deducted from Fair Market Value;

---

[251] In fact, the only taxes referenced in Total Equity Value are those in connection with the transaction – the actual liquidation itself. – *i.e.,* the Liquidation – not taxes previously paid to the Unitholder.

6.      Holdco shall pay Buck, pursuant to Agreement Section 9.10(d) through by check or wire transfer within thirty days of the Court's final order;[252]  and

7.      Buck is entitled to pre-judgment interest at the statutory rate.

If there are any open issues not addressed or mooted by this post-trial opinion, the parties shall notify the Court by letter within five days.  The Court otherwise instructs Buck to prepare a form of order consistent with this opinion and file it with the Court within twenty days of this decision.  If Holdco disputes this form of order, it should notify the Court by letter within five days of filing.

**IT IS SO ORDERED.**

*/s/ Meghan A. Adams*

**Meghan A. Adams, Judge**

---

[252] Although Holdco argues it would have "elected" to pay Buck through a subordinated note pursuant to Section 9.10(d), Holdco does not get to choose its own remedy due to its breach of the Agreement.